Katrina
**MAXTONE–GRAHAM, Plaintiff,**

v.

**James Tunstead BURTCHAELL, Andrews & McMeel, Inc. and Harper & Row Publishers, Inc., Defendants.**

**No. 85 Civ. 1058–CLB.**

United States District Court,
S.D. New York.

April 4, 1986.

Steve Abel, Reeder, Abel & Kossin, New City, N.Y., for plaintiff.

David Schlee, Blum, Kaplan Friedman, New York City, for defendants.

MEMORANDUM & ORDER

BRIEANT, District Judge.

Plaintiff, Katrina Maxtone-Graham brought this complaint against Rev. James Tunstead Burtchaell, Andrews McMeel, Inc., and Harper & Row Publishers, Inc. for copyright infringement. By motions fully submitted November 14, 1985, Defendants have moved for summary judgment in their favor, and plaintiff has moved for summary judgment in her favor on the issue of liability.

In 1971 and 1972 Ms. Maxtone-Graham conducted a series of interviews with seventeen women who responded to her invitation. Each of these women discussed with Ms. Maxtone-Graham on a tape recorder her personal experiences and reactions after having had an unwanted pregnancy. All but four of them had undergone abortions. Each interviewee signed an agreement granting and releasing her rights and interest in the interview to Ms. Maxtone-Graham (Ex. C. to Defendant's Memorandum). These transfer agreements have not, however, been recorded.

After editing the transcripts of her interviews, Ms. Maxtone-Graham compiled them into a book entitled, *Pregnant By Mistake.* Liveright published the book in August 1973. Before it went out of print, *Pregnant By Mistake* sold approximately 2,300 copies, although almost 2,000 of them were sold in the first four months following publication.

In 1976 Rev. Burtchaell, a Roman Catholic priest and a Professor of Theology at the University of Notre Dame, decided to compose a set of essays on the subject and published them as a book entitled, *Rachel Weeping*[1]. In his title essay Rev. Burtchaell presented and commented upon information from *Pregnant By Mistake* and another similar work, *The Ambivalence of Abortion* by Linda Bird Francke. Rev. Burtchaell quoted both books extensively in the essay, although with attribution. Approximately 7,000 of the 37,000 words in the first essay are direct quotations from the interviews in Ms. Maxtone-Graham's book. The first essay represents 60 pages out of a total of 325 pages of text in *Rachel Weeping.*

Rev. Burtchaell wrote to the publishers of both *Pregnant By Mistake* and *The Ambivalence of Abortion* for permission to quote from the works. Random House, Inc., publisher of the latter book, granted that permission in exchange for a $575 payment. Despite several letters and telephone calls to Liveright and its permissions editor, Ms. Mary Ryan, Rev. Burtchaell received no reply until August 1981. At that time Ms. Ryan asked Rev. Burtchaell to forward copy so that she could review the book. Rev. Burtchaell complied with her request. Three months later, in response to a telephone call from Rev. Burtchaell, Ms. Ryan telephoned him to report that Ms. Maxtone-Graham opposed granting the permission.

Rev. Burtchaell then wrote directly to Ms. Maxtone-Graham in an effort to persuade her to grant permission. In reply, Ms. Maxtone-Graham explained her refusal by writing that "[t]he women I interviewed told their stories in order to further understanding of the Pro-Choice view. They believed—and expressly stated—that their material was not to be used for any other purpose. I promised to honor their wishes." Exhibit J to Defendants' Memorandum. Harper & Row published *Rachel Weeping* in April 1982, after advising Rev. Burtchaell that its legal counsel believed that his use of the quotations constituted "Fair Use" of the plaintiff's work.

Defendants have moved for summary judgment on the following two grounds: First, that Ms. Maxtone-Graham's failure to record the transfer agreements bars this action; and second, that Rev. Burtchaell's use of the quotations did not go beyond the amount permitted by the "Fair Use" doctrine.

*Jurisdiction*

■ Rev. Burtchaell quoted only the interviewees' words and not Ms. Maxtone-Graham's. She does not claim, therefore, that she has her own copyright interest in the portions used by Rev. Burtchaell. Nor can she make that claim. Courts have consistently held that "the use of conversations attributed to other persons cannot be a borrowing of copyrighted material, because of the Act's requirement, 17 U.S.C.

1. The title refers to Herod who "sent forth, and slew all the children that were in Bethlehem, and in all the coasts thereof, from two years old and under.... [t]hen was fulfilled that which was spoken by Jeremy the Prophet, saying, In Rama was there a voice heard, lamentation and weeping, and great mourning, Rachel weeping for her children, and would not be comforted because they are not." Matt. 2:16, 18. See also Jer. 31:15.

§ 102(a), that an author's work be his own and not originate in others." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 205 (2d Cir.1983) *rev'd on other grounds*, — U.S. —, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). She claims instead that she obtained a copyright in the words of the interviewees in her book as a result of written transfers. Defendants argue that the Copyright Act of 1976 requires her to record these transfers as a prerequisite to her suit. The relevant portion of the Act provides that:

> No person claiming by virtue of a transfer to be the owner of copyright or of any exclusive right under a copyright is entitled to institute an infringement action under this title until the instrument of transfer under which such person claims has been recorded in the Copyright Office, but suit may be instituted after such recordation on a cause of action that arose before recordation.

17 U.S.C. § 205(d)

In 1973, when Ms. Maxtone-Graham published her book, a prior version of the Copyright Act was in effect. At that time, the Act did not require her to record the transfers to protect her copyright interest in them. *See New Fiction Publishing Co. v. Star Co.*, 220 F. 994 (S.D.N.Y.1915). Ms. Maxtone-Graham claims that she would not have published the book if the copyright law had then required her to record each transfer agreement. This is because the interviewees, although they strongly support elective abortion, have, at the same time, insisted on keeping their identities secret; recordation of the transfer agreements would deny this promised anonymity because their names would be on file in the United States Copyright Office as a public record.

Defendants interpret 17 U.S.C. § 301(a), enacted as part of the 1976 Copyright Act as having the effect of making the Old Copyright Act provisions inapplicable to suits brought under the 1976 Act. Section 301(a) provides that:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished; are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

As the final sentence of this section suggests, and the Committee Report confirms, Congress included this provision to limit pre-existing *state* copyright protection schemes, and to make clear their intention to create a single Federal system for copyright protection. Thus, this section was included and framed in this manner "so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection." Notes of Committee on the Judiciary, House Report cited in 17 U.S.C.A. § 301, at 271 (1977).

Contrary to defendants' assertions, § 301(a) does not preclude the application of the prior Federal copyright laws where appropriate to the case. Professor Nimmer has explained that "[t]he *ownership* of rights asserted after January 1, 1978 will often turn on the validity of grants executed pre-1978." 3 Nimmer, The Law of Copyright, § 10.03[B] at 10–37. (emphasis added) Defendants do not assert that Ms. Maxtone-Graham failed to obtain the ownership of the rights. Rather they insist that this Court may not exercise jurisdiction of her claim unless and until she records the transfer agreements, something she cannot do without breaching her promise of anonymity given to the persons interviewed. She made this promise at a time when such a promise could be honored without rendering her copyright unenforceable.

Federal Courts have consistently required plaintiffs to record pre-1978 transfers before bringing infringement com-

plaints. *See, e.g., Nation's Choice Vitamin Co., Inc. v. General Mills, Inc.,* 526 F.Supp. 1014, 1017 (S.D.N.Y.1981). Plaintiffs have realized no hardship because of this requirement. They are permitted to record the transfers and subsequently amend their complaint or refile the action. *See Northern Songs, Ltd. v. Distinguished Productions,* 581 F.Supp. 638, 641 (S.D.N.Y.1984). That solution is apparently unavailable in this context. Ms. Maxtone-Graham's right, obtained under the prior law, permitted private enforcement of her copyright without recordation. She relied on this arrangement when she negotiated the transfers with the interviewees. Her ability to obtain candid and forthcoming interviews, or any interviews at all, would have been greatly diminished if she could not have promised anonymity. Plaintiff expended a significant investment of time and effort in preparing *Pregnant by Mistake,* and she expected to earn a financial reward for her endeavors. Without the copyright protection, and the economic incentive it provides, she would not have written the book. Her book, like *Rachel Weeping,* is a serious and scholarly work intended to add to public knowledge and discourse involving a significant moral, social and political issue.

Congress could not have intended the 1976 Act to bar the rights of those who own works published and copyrighted validly under the earlier Act, and find themselves unable for practical reasons then unforeseeable, to record their prior transfers now. Defendants do not deny that the prior transfers exist. They were produced in pre-trial discovery with names deleted. Defendants are not prejudiced by failure to record, because they had actual notice of these transfers. Accordingly, plaintiff's failure and her inability to record the transfers under the New Copyright Act will not bar her complaint under the special circumstances which exist here and preclude recordation.

*Defense of Fair Use*

■ This case highlights the apparent tension created by the coexistence of the Copyright Clause, which authorizes Congress to grant to authors "the exclusive right" to their "writings", U.S. Const. Art. I, § 8, Cl. 8, and the First Amendment to the United States Constitution. The Copyright laws protect an author's incentive to publish by granting him or her extensive control over the publication and republication of his or her original works. Occasionally, as in this case, this policy must yield to the right of persons to engage in full and free public discourse of ideas and issues protected by the First Amendment. To satisfy these First Amendment requirements, Courts have mitigated the chilling effect of copyright law upon free expression, as well as future creativity and scholarship, by developing two doctrines—the Defense of Fair Use (now codified in 17 U.S.C. § 107) and the so-called Ideas/Expression dichotomy. Courts apply the latter principle to "strike a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 203 (2d Cir.1984) *rev'd on other grounds,* —— U.S. ——, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), hereinafter, the *Nation* case.

In the *Nation* case, the Supreme Court purported to reject the view, at least in the factual context there presented, that the "scope of fair use is wider when the information conveyed relates to matters of high public concern." *Nation,* 105 S.Ct. at 2228. This apparently far ranging *dictum* must be recognized for what it is, and limited by the context of that case. The *Nation* magazine had obtained the unpublished manuscript of former President Ford's memoirs, *A Time to Heal,* in a manner like unto larceny. Before *Time* magazine could publish excerpts which it had purchased, the *Nation* published its own article with excerpts, to the economic detriment of the author and publisher. The Supreme Court held that the *Nation's* article was not a "fair use" within the meaning of 17 U.S.C. § 107. As the Court explained, "fair use analysis must always be tailored to the individual case." *Id.* at 2227. The Court found the right to first publication, the

right at issue in that case, "inherently different" from other publication rights because its value comes from its exclusivity. *Id.* Once someone else has published the essentially same thing that right becomes meaningless. Consequently, the Court reasoned that continued activity of this sort would restrict rather than enhance public discourse and debate. At the same time, the Court reaffirmed the importance of "the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use." *Id.* at 2230. Accordingly, the *Nation* case at most stands for the proposition that First Amendment considerations will not bolster a fair use defense when plaintiff has quoted from an unpublished work; viewed as a whole the opinion does not support a conclusion which the quoted *dictum* appears to suggest. Public speech which is directly related to matters of high public concern *is* entitled to different consideration when the issue of fair use is presented. *See, e.g., Diamond v. Am-Law Publishing Corp.,* 745 F.2d 142, 148 (2d Cir.1984) (holding that informational work may be more freely published under a fair use defense than those of a creative nature).

Whether Rev. Burtchaell's verbatim copying of the quotations from Ms. Maxtone-Graham's book was fair use or not must therefore be determined by this Court according to the traditional equities which include First Amendment content related considerations.

Plaintiff asserts that defendants may not avail themselves of the equitable fair use defense because of bad faith on their part. She bases her claim of bad faith on two points: First, that defendants violated "the custom and usage of the publishing industry not to claim fair use after permission to quote copyrighted material has been denied." (Brief at 7); and second, that the amount that Rev. Burchtaell quoted in his first essay was so great that the Court must presume bad faith on his part.

Some publishing houses may, as Mr. Schmalzer of Liveright claimed in his deposition, choose not to publish excerpts when permission has been denied. Plaintiff's Memorandum, Ex. F. No such custom has been shown to be embraced by the publishing industry as a whole. Nor did Mr. Schmalzer in fact make such a broad claim. Ultimately, he conceded that it was only "a working policy" at some of the publishing houses at which he had worked. Such a custom or practice if granted any force in this Court would arrogate to publishers the absolute power to determine what constituted a "fair use" whenever a defendant first sought permission to quote. Since the doctrine of fair use is a legal doctrine having Constitutional implications, it cannot be subject to definition or restriction as a result of any such trade custom or practice, no matter how long continued. Accordingly, even if such a custom were shown to exist industry wide, and it has not been, it could have no legal force.

The quantity copied by a subsequent author will not, by itself, determine whether or not a use is "fair". As codified by Congress, the amount copied is only one of several factors that courts must examine when they assess the fairness of a use. Moreover, the House Report cautioned that "no generally applicable definition is possible and each case raising the question must be decided on its own facts." House Report at 65, in U.S.Code Cong. & Admin. News at 5659, 5678 (1976).

Section 107 of the Act lists the following four factors as particularly relevant when assessing whether a use is "fair":

(1) The purpose and character of the use, including whether such use is of a commercial nature or is for a non-profit educational purpose; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

We examine each of these factors in turn.

*Purpose and Character of the Use*

Harper & Row published *Rachel Weeping* as a commercial venture. Although

Rev. Burtchaell and perhaps Harper & Row viewed the work as scholarly and a contribution to the national debate on elective abortion, it was a "for profit" endeavor. Harper & Row paid Rev. Burtchaell a $5,000 advance and advertised the book nationally. An educational use rendered for profit amounts to a "commercial" use. That conclusion, however, does not negate a fair use determination. *Rosemont Enterprises Inc. v. Random House, Inc.*, 366 F.2d 303, 308 (2d Cir.1966). Because commercial and scholarly or artistic elements are each present in any publication, our Court of Appeals has held that "whether an author or publisher has a commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes fair use." *Id.* at 307.

Rev. Burtchaell, who represents that he belongs to a religious order and has taken the vow of poverty, did not author the essays with a primary purpose of financial gain. He could not have expected or intended to sell many more than the 6,000 copies of *Rachel Weeping* ultimately sold. The book was his attempt to make a non-dogmatic scholarly argument on behalf of the Pro-Life viewpoint. In order to write persuasively and without arousing the suspicion of the reader, he felt obliged to quote, rather than paraphrase, the words of the so-called "abortion veterans" interviewed by plaintiff and Ms. Francke. His aim was not to save his own time, or to exploit plaintiff's efforts, but to analyze these personal accounts in the most effective and persuasive manner. Justice Story explained in *Folsom v. Marsh,* 9 F.Cas. 342, 344 (C.C.D.Mass.1841) that, "no one can doubt that a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism." An objective reader of *Rachel Weeping* would never confuse that work with the original *Pregnant by Mistake,* nor find that its author intended to supplant that work in the marketplace with his own.

*The Nature of the Copyrighted Work*

Although both books were published for sale to the hardcover book buying public and, specifically, to those seriously interested in the issue of elective abortion, the similarity between them ends there. *Pregnant By Mistake* is essentially reportorial in nature. Defendants have attempted to characterize the book as the product of "mere diligence" like the index at issue in *New York Times Co. v. Roxbury Data Interface, Inc.,* 434 F.Supp. 217, 221 (D.N. J.1977). However, as the statement from the American Society of Journalists and Authors, Inc. submitted on the motion (Ex. B to Plaintiff's Brief) makes clear, interviewing and writing are not as simple as turning on a tape recorder. As journalism, *Pregnant By Mistake* is entitled to the same protection as any copyrighted news story, biography or other collection of facts and the opinions of others than the collecting journalist.

Copyright law permits heavier reliance by later authors when the earlier work is essentially factual in nature. As our Court of Appeals has explained:

> "[b]iographies, of course are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works. This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e.g., so 'that the world may not be deprived of improvements, or the progress of the arts retarded.' *Sayre v. Moore,* 102 Eng.Rep. 138, 139 (K.B. 1801)." *Rosemont Enterprises* at 307.

*Pregnant By Mistake* is essentially a book of source material. The advancement of the social sciences and public discourse on an important issue is enhanced by permitting liberal, but fair, use of such materials.

*Amount Quoted in Relation to the Copyrighted Work*

*Rachel Weeping* includes 4.3% of the words in *Pregnant By Mistake.* In this

context such verbatim repetition is not inconsistent with a finding of fair use. As explained above, Rev. Burtchaell believed, probably correctly, that he needed to present portions of these individual abortion experiences in the same words in order to critique them fairly. In light of his stated purpose of examining the reasons women choose abortion, 5% is not a level of quotation beyond the bounds of fair use.

*Effect on the Potential Market*

The effect of the use on the potential market for the copyrighted work "is undoubtedly the single most important element of fair use." *Nation*, 105 S.Ct. at 2218. Professor Nimmer explains that "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." 1 Nimmer § 1.10[D] at 1–87. This factor becomes even more important in the present context. If plaintiff cannot demonstrate that she has suffered any adverse economic impact, then the "free speech" considerations subsumed in the first two factors of the fair use analysis militate wholly in favor of the defendants.

Where a defendant's work performs a different function than a plaintiff's, then the use is not considered to be unfair. 3 Nimmer § 13.05[B] at 13–78. *Pregnant By Mistake* is a book of interviews. Although these are edited, the book offers no analysis. *Rachel Weeping* analyses and comments upon both Ms. Maxtone-Graham's book and the *Ambivalence of Abortion;* as such it complements, rather than supplements these earlier works. Because it serves a different function, Rev. Burtchaell's work has not had an adverse effect on the potential market for Ms. Maxtone-Graham's book.

*Pregnant By Mistake* "was going out of print" when *Rachel Weeping* was published in August 1982. Plaintiff's Memorandum at 26. Although going out of print does not terminate a copyright, it is an appropriate element to consider when assessing the impact on a copyrighted work's potential market. "If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it." *Nation*, 105 S.Ct. at 2227 (quoting from the Senate Report to the 1976 Copyright Act). Ms. Maxtone-Graham's book had essentially become "unavailable." Only 2,400 copies had been sold since its first publication in 1973, and only one copy had been sold since April, 1981. Thus, even if *Rachel Weeping* might have had some functional equivalency to *Pregnant By Mistake*, which it did not, the latter had no market to be harmed.

*Conclusion*

Defendants have proved on the motion, as a matter of indisputable fact, that Rev. Burtchaell made fair use of Ms. Maxtone-Graham's work and the interviews therein. Indeed, Ms. Maxtone-Graham has evidently objected to this use solely in an effort to limit further scholarship using her own scholarly investigation as a base or starting point, and she has done so simply because the views or opinions of the later work do not coincide with her own or those of her interviewees. Such an objection has no merit. Neither plaintiff nor her subjects can properly claim a right to stifle further discourse. Objection by a quoted author to the viewpoint espoused by the subsequent user is simply not relevant to an inquiry into the lawfulness of that use under the Fair Use doctrine.

For the foregoing reasons, Defendants' motion for summary judgment is granted, and plaintiff's motion is denied. The Clerk shall enter final judgment that all relief shall be denied.

So Ordered.