Katrina **MAXTONE–GRAHAM**,
Plaintiff-Appellant,

v.

James Tunstead **BURTCHAELL**, Andrews & McMeel, Inc., and Harper & Row Publishers, Inc., Defendants-Appellees.

No. 92, Docket 86–7349.

United States Court of Appeals,
Second Circuit.

Argued Sept. 11, 1986.
Decided Oct. 15, 1986.

Steven L. Abel, Reeder, Abel & Kossin, New City, N.Y., for plaintiff-appellant.

David R. Schlee, Smith, Gill, Fisher & Butts, Inc., Kansas City, Mo., Randy Lipsitz, Bluhm, Kaplan, Friedman, Silberman & Beran (of counsel), New York City, for defendants-appellees.

Before KAUFMAN, WINTER and PRATT, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Nearly half a century ago, a distinguished panel of this Court including Learned Hand called the question of fair

use "the most troublesome in the whole law of copyright," *Dellar v. Samuel Goldwyn, Inc.*, 104 F.2d 661, 662 (2d Cir. 1939) (per curiam). That description remains accurate today. Since Judge Hand's time, the common law doctrine has been inscribed into the Copyright Act, but the fair use inquiry continues to require a difficult case-by-case balancing of complex factors. The purpose of fair use is to create a limited exception to the individual's private property rights in his expression—rights conferred to encourage creativity—to promote certain productive uses of existing copyrighted material. Fair use has been defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner [by the copyright]." [1]

In this case, we are asked to decide whether the district court properly granted summary judgment in favor of the defendants on the basis of the affirmative defense of fair use in an action for copyright infringement. Plaintiff had published a book of interviews with women discussing their experiences with abortion and unwanted pregnancy. Several years later, defendant Burtchaell was preparing a series of essays on abortion, and requested permission to quote extensively from plaintiff's interviews. Despite the denial of permission, he included numerous verbatim quotations in his book.

Plaintiff commenced an action for copyright infringement in the Southern District of New York (Charles L. Brieant, *District Judge*), 631 F.Supp. 1432. Defendants moved for summary judgment, pursuant to Fed.R.Civ.P. 56, on two grounds: failure to file the copyright assignments and fair use. Plaintiff then unsuccessfully cross-moved for summary judgment on the question of liability. Defendants' motion contended first that the district court lacked jurisdiction because plaintiff failed to record with the Copyright Office the assignments that she obtained from the women interviewed. Defendants maintained that the 1976 amendments to the Copyright Act, which require that such transfer agreements be filed, applied retroactively to plaintiff's pre–1976 assignments.[2] The district court rejected defendants' interpretation of the copyright amendments and declined to grant summary judgment on this basis.

Because we now affirm the lower court's grant of summary judgment on the fair use defense, we find it unnecessary to reach the recordation argument. Instead, we shall assume *arguendo* that the plaintiff's copyrights were valid and proceed directly to the fair use question. At the outset, we acknowledge that summary judgment on the question of fair use has been the exception rather than the rule. After analyzing the alleged facts in dispute and the fair use factors, however, we conclude that the fair use defense was properly sustained at the summary judgment stage, even when the

1. *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), (*quoting* Ball, *The Law of Copyright and Literary Property* 260 (1944)).

2. The relevant portion of the Act provides that:
   No person claiming by virtue of a transfer to be the owner of copyright or of any exclusive right under a copyright is entitled to institute an infringement action under this title until the instrument of transfer under which such person claims has been recorded in the Copyright Office, but suit may be instituted after such recordation on a cause of action that arose before recordation.
   17 U.S.C.Sec. 205(d) (1982). When Maxtone-Graham published *Pregnant by Mistake* in 1973,

the Act did not require her to record the transfers, and she claims she would have been unable to publish the book if recordation was required because she would have been forced to compromise the anonymity of the women. In view of this, the district court held that:
   Congress could not have intended the 1976 Act to bar the rights of those who own works published and copyrighted validly under the earlier Act, and find themselves unable for practical reasons then unforeseeable, to record their prior transfers now.... Accordingly, plaintiff's failure and her inability to record the transfers under the New Copyright Act will not bar her complaint under the special circumstances which exist here and preclude recordation.

facts are considered in the light most favorable to plaintiff.

## A. FACTS

### 1. *Pregnant by Mistake*

In 1973, Katrina Maxtone-Graham published a book entitled *Pregnant by Mistake,* consisting of interviews with 17 women who had discussed with her their unwanted pregnancies. The names of the interviewees were changed to assure anonymity. Most of the women discussed the circumstances surrounding their abortions, but some explained decisions to carry a pregnancy to term and either to give the child up for adoption or raise the child themselves. Maxtone-Graham tape recorded all of the interviews, and after having transcripts prepared, she edited the texts to avoid repetition and unnecessary verbiage. At the time of the interviews, all of the women signed copyright assignments in favor of the plaintiff, but these agreements were never recorded with the Copyright Office.

In August 1973, Liveright published *Pregnant by Mistake,* and 2,349 copies of the book were sold from the day of publication (August 31, 1973) to the day it went out of print (March 31, 1982), with almost 2,000 of the sales occurring within four months of publication. On February 25, 1982, just before her book was to go out of print, Maxtone-Graham obtained from Liveright all publishing rights to *Pregnant by Mistake.* Maxtone-Graham owns a small publishing company, and her stated intention was to produce a "very small printing for people who have requested copies" at an indefinite time in the future. To date,

no second edition of the book has been published.

### 2. *Rachel Weeping*

James Tunstead Burtchaell is a Catholic priest and professor of theology at the University of Notre Dame, where he has served on the faculty since 1966. He first decided to write *Rachel Weeping,* the sixth of his books, in 1976 and completed the title essay in August 1978. This essay is the only one in the book containing quotations from *Pregnant by Mistake.* Burtchaell maintains that the purpose of *Rachel Weeping* was to critique the published accounts of "abortion veterans," and that the book was aimed at the relatively small group of people interested in the public debate on abortion. He drew upon two primary sources in the title essay: *Pregnant by Mistake* and *The Ambivalence of Abortion* by Linda Bird Francke. Burtchaell offered a general characterization of Maxtone-Graham's book in his essay and mentioned the author's name. When he quoted from *Pregnant by Mistake,* he usually credited the source.

In the first few pages of his essay, Burtchaell explained that he regarded Maxtone-Graham's interviews as helpful source material, but that his own intention was to move beyond anecdotal reflection and offer a framework for analysis of the women's experiences.[3] In a deposition, Burtchaell said he considered paraphrasing from the interviews, but felt "it [was] essential for the credibility of my essay that the words of abortion veterans themselves appear." He also decided that, as a Catholic priest, conducting his own interviews would pose credibility problems and that his book

**3.** Burtchaell explained the purpose of the essay at the outset:

What makes these two books helpful is that both authors have let the women and men unfold their personal experience of abortion in all its confusion and hurt and courage and isolation. Their stories are rich and varied enough to sustain inquiry beyond (and sometimes athwart) what the interviewers say by way of summary....

\* \* \* \* \* \*

What Francke and Maxtone-Graham do not offer is any systematic reflection on what their interviewees have told them. Had they undertaken such an analysis, they would have seen emerging—from the veterans of the abortion experience—a profoundly unsettling story. Their documentation of the abortion experience is strong evidence—stronger in some sense than the indictments of antiabortionists—against the portrayal of abortion by its advocates.

*Rachel Weeping* at 2–3.

would be perceived as fairer if he relied on interviews conducted by those who sympathize with the "pro-choice" view of abortion.

The first essay in *Rachel Weeping* was approximately 37,000 words long, and about 7,000 of these were direct quotations from the interviews in *Pregnant by Mistake.* Burtchaell's book contains 325 pages of text, and the title essay filled 60 pages. The district court found that *Rachel Weeping* includes 4.3 percent of the words in *Pregnant by Mistake.*

### 3. Denial of Permission to Quote

Burtchaell first requested permission to quote from *Pregnant by Mistake* "beyond the usual 500 or 1,000 word limit" in a letter to Liveright dated August 17, 1978. He sent the letter shortly after completing the first *Rachel Weeping* essay. When he received no reply to the letter, Burtchaell telephoned Liveright and was told that detailed production and financial information would have to be provided before his request could be considered. The next communication was in June 1981, when Burtchaell furnished the information and again requested permission, stating that he wished to quote about 5,000 words. In August 1981, Liveright asked Burtchaell to supply a copy of the essay for Maxtone-Graham to examine, and he did so. On November 4, 1981, Mary Ryan, an employee of Liveright, telephoned Burtchaell to inform him that Maxtone-Graham opposed granting permission and that Liveright would honor her request.

On November 6, 1981, Burtchaell wrote directly to Maxtone-Graham through Liveright, setting forth his predicament and urging her to reconsider. He explained to her that he had undertaken an analytical work, and thought it natural for him to comment on her essentially reportorial book.[4] By letter dated December 7, 1981, Maxtone-Graham once again denied permission. She explained that the interviewees "told their stories in order to further understanding of the Pro-Choice view," and that she promised to honor their wishes. After consulting counsel, Burtchaell and Andrews & McMeel, the hardcover publisher, decided to proceed with publication of *Rachel Weeping* as written. The book was published on April 1, 1982, and Harper & Row produced a softcover edition in 1984.

Maxtone-Graham makes several arguments on appeal in her attempt to demonstrate that the grant of summary judgment in favor of defendants was improper. First, she alleges that Burtchaell made numerous errors in quoting from her book. She concedes that many of the mistakes were trivial, but she also argues that Burtchaell misled his readers by quoting women describing their experiences with adoption as if they were discussing abortion. These errors, she maintains, rob the work of scholarly quality and make Burtchaell's purpose in quoting from *Pregnant by Mistake* suspect. Among her other claims is that the quantum of use was excessive and that the infringement harmed her economic interests. Maxtone-Graham also maintains that Burtchaell acted unfairly by first seeking permission and then proceeding to quote from the interviews after permission had been denied. Finally, she argues that there is a real issue concerning her motivation in denying permission. We shall return to these contentions momentarily.

## B. SUMMARY JUDGMENT AND FAIR USE

The general principles that this court has developed in regard to summary judgment,

---

**4.** In his letter to Maxtone-Graham, dated November 6, 1981, Burtchaell wrote:

> The method of your book was essentially reportorial. You interviewed well, gave the people their say, and presented it in print as they had explained themselves. For another writer to come along afterwards and offer comment on the interviews seems to be not only acceptable but desirable. I am not contradicting your analysis, because you did not wish to do that kind of book. In fact, you would not have published the interviews had you not considered them challenging and thoughtful. It seems to me that an analysis of them, and a comparison with the Francke material, is a very natural sequel to your work, and one that you would welcome.

of course, apply with equal vigor to the fair use determination. We have said repeatedly that on a motion for summary judgment

> the court cannot try issues of fact; . . . it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, . . . with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. . . .

*George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 555 (2d Cir.1977) (quoting *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)). Because the fair use question is so highly dependent on the particular facts of each case, courts generally, including this court, have usually found it appropriate to allow the issue to proceed to trial. *DC Comics, Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 27–28 (2d Cir.1982); *Meeropol v. Nizer,* 560 F.2d 1061, 1068–71 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). In *DC Comics,* for example, we held:

> The fair use defense turns not on hard and fast rules but rather on "an examination of the facts in each case." . . . The four factors listed in Section 107 raise essentially factual issues and, as the district court correctly noted, are normally questions for the jury.

696 F.2d at 28.

This court, however, has never suggested the adoption of a *per se* rule granting a plaintiff in a copyright infringement case immunity from the perils of Rule 56 when a defendant interposes the defense of fair use.[5] Nor do we feel that movement toward such a rule would be defensible in terms of precedent and good sense.

Courts in this Circuit have approved the resolution of the fair use question at the summary judgment stage on several occasions. *See, e.g., Berlin v. E.C. Publications, Inc.,* 329 F.2d 541 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964); *Time Inc. v. Bernard Geis Associates,* 293 F.Supp. 130, 146 (S.D. N.Y.1968) (summary judgment granted for defendant on fair use defense in view of public interest behind defendant's use of copyrighted materials and failure of plaintiff to show injury). Frequently, more complete development of the record will be necessary before a ruling can be made, but in other cases, the fair use defense will be sustainable as a matter of law. "[T]he mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues *to be tried.*" *Meeropol v. Nizer,* 417 F.Supp. 1201, 1208 (S.D.N.Y.1976), *rev'd in part on other grounds,* 560 F.2d 1061 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). Recently, in granting summary judgment on the grounds of fair use, one court observed that

> the essential character of the fair use doctrine as an "equitable rule of reason," *see Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984), makes it all the more appropriate for the court itself to decide whether the fair use defense applies when the historical facts underlying each of the four factors are not disputed.

*Hustler Magazine, Inc. v. Moral Majority, Inc.,* 606 F.Supp. 1526, 1532 (C.D.Cal.1985), *aff'd,* 796 F.2d 1148 (9th Cir.1986).

---

**5.** The days of *Arnstein v. Porter,* 154 F.2d 464 (2d Cir.1946) are behind us. In *Arnstein,* Judge Frank declined to grant summary judgment although defendants had demonstrated that plaintiff's claim was completely devoid of merit. In *Heyman,* we signalled a new direction in our treatment of summary judgment:

> Although for a period of time this Circuit was reluctant to approve summary judgment in any but the most extraordinary circumstanc-

es, *see, e.g., Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir.1946), that trend has long since been jettisoned in favor of an approach more in keeping with the spirit of Rule 56. . . .

524 F.2d at 1319. *See also, Williams v. McAllister Brothers, Inc.,* 534 F.2d 19 (2d Cir.1976); *United States v. Matheson,* 532 F.2d 809 (2d Cir.1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

Admittedly, the fair use determination often requires a complex and subtle evaluation of numerous mixed issues of fact and law. When the law requires a judgment for defendant, however, the difficulty of the fair use question is not a valid reason to shy away from summary judgment. In the case before us, the parties frequently offer different *characterizations* of the facts, but generally do not seriously dispute the relevant sequence of events preceding the controversy. The distinction between the portrayal of the facts and the facts themselves is subtle—some might say elusive—but without it the summary judgment tool would be rendered a nullity. Where facts in the instant case are in dispute, they would not affect the ultimate decision on the fair use question even if resolved in plaintiff's favor.

## C. THE FAIR USE DEFENSE

The roots of what we now know as "fair use" are firmly planted in the early English common law, where the defense was known as "abridgment." One of the earliest cases to raise the issue was *Gyles v. Wilcox*, 2 Atk. 141 (1740) (No. 130), a decision upon a bill for an injunction to stay the publication of a legal treatise. Lord Chancellor Hardwicke evaluated the defense of abridgment:

> Where books are colourably shortened only, they are undoubtedly within the meaning of the [copyright act], and are a mere evasion of the statute, and cannot be called an abridgment.

> But this must not be carried so far as to restrain persons from making a real and fair abridgment; for abridgments may, with great propriety, be called a new book, because not only the paper and print, but the invention, learning, and judgment of the author is shewn in them, and in many cases are extremely useful, though in some instances prejudicial, by mistaking and curtailing the sense of an author.

*Id.* at 143. From the earliest days of the doctrine, courts have recognized that when a second author uses another's protected expression in a creative and inventive way, the result may be the advancement of learning rather than the exploitation of the first writer.

Fair use made its debut in American law with Justice Story's opinion in *Folsom v. Marsh*, 9 F.Cas. 342 (C.C.D.Mass.1841) (No. 4,901).[6] *Folsom* involved a dispute over two biographical works about George Washington. The following passage is probably the most frequently cited one from Justice Story's discussion:

> In short, we must often, in deciding questions of this sort, look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work.

*Id.* at 348. He framed his analysis in terms of two extremes. At one extreme was the studied evasion, in which "the whole substance of one work has been copied from another, with slight omissions and formal differences only...." *Id.* at 344. At the other extreme was the use of verbatim portions of an earlier work to review or criticize. Justice Story wrote of this type of use:

> [N]o one can doubt that a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if he thus cites the most important parts of the work, with a view, not to criticise, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy.

*Id.* at 344–45.

As Justice Story observed, however, many uses would fall somewhere in between the two extremes. To evaluate cases falling in the gray area, he proposed

---

**6.** Actually, many of the issues addressed in *Folsom* were anticipated by Justice Story's opinion in *Gray v. Russell,* 10 F.Cas. 1035 (C.C.D.Mass. 1839) (No. 5,728).

an inquiry into the infringer's creative effort. In order to have a lawful abridgment, he said,

> [t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work.

*Id.* at 345.

## D. THE FOUR-PART INQUIRY OF SECTION 107

It is remarkable how much of the flavor of Justice Story's analysis remains intact in Section 107 of the Copyright Act of 1976. In enacting the legislation, Congress noted that its purpose was to "restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 66 (1976) *reprinted in* 1976 U.S. Code Cong. & Admin. News 5659, 5680 ("House Report"); S.Rep. No. 473, 94th Cong., 1st Sess. 62 (1975). At the same time, however, the legislature expressed its intention to give courts the freedom to adapt the doctrine to particular situations on a case-by-case basis, in light of changing technology. 17 U.S.C. Sec. 107 reads as follows:

> Sec. 107. *Limitations on exclusive rights: Fair use*

> ■ Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

The factors listed in the statute are not intended to be exclusive: "[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." House Report at 65, *quoted in Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588. They are, however, particularly relevant to the fair use question. We address each factor separately.

### 1. *Purpose and Character of Use*

The fair use provision of the Copyright Act expressly mentions "criticism" and "comment" as favored under the statute, and we think it indisputable that Burtchaell employed the material from *Pregnant by Mistake* for just such purposes. Certainly, *Rachel Weeping* is not merely the product of "the facile use of the scissors," to borrow Justice Story's phrase in *Folsom.* Rather, Burtchaell's work takes portions of the free form interviews and organizes them into a topical framework to make the case against abortion. One need not agree with the merit, methodology or conclusions of *Rachel Weeping* to recognize that Burtchaell applied substantial intellectual labor to the verbatim quotations, continually offering his own insights and opinions. As the district court found, Burtchaell drew upon published primary sources "to write persuasively and without arousing the suspicion of the reader...." We also agree with Judge Brieant that "[a]n objective reader of *Rachel Weeping* would never confuse that work with the original *Pregnant by Mistake,* nor find that its author intended to supplant that work in the marketplace with his own."

#### a. *Commission of Error*

Maxtone-Graham argues, however, that Burtchaell's scholarly purpose is contra-

dicted by inaccuracies that riddle his use of the quotations. She alleges that *Rachel Weeping* contains scores of minor mistakes involving capitalization, punctuation and so forth, and dozens more serious errors in which statements were taken out of context or distorted.[7] The district court failed to consider the element of error, but after comparing the two books, we conclude that many of appellant's charges are well-founded—especially those relating to the muddling of adoption and abortion experiences. Burtchaell's scholarship clearly leaves something to be desired, and it is equally unfortunate that the numerous inaccuracies in *Rachel Weeping* escaped the editors' attention.

The commission of errors in borrowing copyrighted material is a proper ingredient to consider in making the fair use determination. *Meeropal v. Nizer*, 560 F.2d 1061, 1071 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). It is, however, but one of many factors. In view of our evaluation of the other fair use elements, we conclude that the errors in *Rachel Weeping* do not place the work beyond the pale of fair use. In *Gyles v. Wilcox*, the court noted that an otherwise "fair abridgment" might sometimes be "prejudicial, by mistaking and curtailing the sense of an author." 2 Atk. at 143. Furthermore, as a judicial body, we consider it highly undesirable to hinge a legal determination solely on the relative truth or accuracy of statements made in the context of debate on a highly volatile social issue. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 278–83, 84 S.Ct. 710, 725–28, 11 L.Ed.2d 686 (1964). Nor do we think it wise to give much legal relevance to whether the allegedly infringing work may be labeled "scholarly" or "dogmatic," for the dogma of one individual may be the original scholarship of another. Only where the distortions were so deliberate, and so misrepresentative of the original work that no reasonable person could find them to be the product of mere carelessness would we incline toward rejecting a fair use claim. The errors in *Rachel Weeping* do not cross that threshold.

### b. *Commercial Use*

The Supreme Court recently addressed the question of fair use in *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 447–55, 104 S.Ct. 774, 791–95, 78 L.Ed.2d 574 (1984) (time-shifting by owners of home video tape recorders constitutes fair use) and in *Harper & Row, supra* (magazine's appropriation of right of first publication of former President Ford's un-

---

**7.** Maxtone-Graham alleges that on at least ten separate occasions, *Rachel Weeping* quoted the women as though they were discussing abortion, when in reality they were discussing adoption. She has submitted to the Court a detailed list of more than 50 alleged errors made by Burtchaell, and she contends there are numerous others. The following errors are representative of those alleged by appellant:

At page 9 of *Rachel Weeping*, the quotation from *Pregnant by Mistake*, at pages 53–54, is inaccurate (a) as the quotation does not concern difficulty in talking to a father about being pregnant but rather about difficulty in bringing an illegitimate baby home to the woman's parents; (b) because the quoting changes words; (c) because words omitted from the quote are not noted; and (d) because Betsy states at page 49 of *Pregnant by Mistake* that she could have told her parents about abortion.

\* \* \* \* \* \*

At page 20 of *Rachel Weeping*, the quote from *Pregnant by Mistake*, page 104, is quoted out of context because it does not pertain to reasons for abortion but rather to an explanation of not later regretting having an abortion.

\* \* \* \* \* \*

At pages 42–43 of *Rachel Weeping*, the quote from *Pregnant by Mistake*, pages 420–22, is not in answer to a question about counseling, as stated in *Rachel Weeping*, but rather in answer to a question about relinquishing a child for adoption.

\* \* \* \* \* \*

At page 43 of *Rachel Weeping*, the quotes from *Pregnant by Mistake*, pages 420–22, are quoted out of order without an indication that they have been reordered.

\* \* \* \* \* \*

The statement at page 6 of *Rachel Weeping* that only two interviewees did not choose abortion is a half-truth, as three other women interviewed in *Pregnant by Mistake* had both abortion and adoption experiences.

published manuscript not a fair use). These cases include discussion of how a commercial use affects the fair use inquiry. Maxtone-Graham maintains that *Sony Corp.* and *Harper & Row* require judgment against Burtchaell. We address the Supreme Court's recent pronouncements to show why appellant's suggestion that any income-producing use is unfair virtually by definition falls wide of the mark. In *Sony Corp.*, the Court stated:

> *Although not conclusive*, the first factor requires that "the commercial or non-profit character of an activity" be weighed in any fair use decision.... [A]lthough every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter.

464 U.S. at 448-49, 451, 104 S.Ct. at 792, 793 (emphasis added). Appellant makes much of the last sentence, but we do not read it as altering the traditional multifactor fair use inquiry. Indeed, the Court relied on a House report which states that the statutory language requiring consideration of "whether such use is of a commercial nature or is for nonprofit educational purposes" was

> not intended to be interpreted as any sort of not-for-profit limitation on educational uses of copyrighted works. It is an express recognition that, as under the present law, the commercial or non-profit character of an activity, while not conclusive with respect to fair use, can and should be weighed along with other factors in fair use decisions.

464 U.S. at 449 n. 32, 104 S.Ct. at 792 n. 32 (quoting House Report at 66, U.S.Code Cong. & Admin.News 1976, p. 5679). This understanding was reflected in *Harper & Row*, in which the Court noted: "The fact that a publication was commercial as opposed to non-profit is a separate factor that *tends to* weigh against a finding of fair use." 105 S.Ct. at 2231 (emphasis added). Only an unduly narrow reading of the language in *Sony Corp.* and an inattention to the context could lead to the conclusion

that the Court intended to attach heightened significance to the element of commerciality.

■ It is undisputed that Burtchaell was paid for his efforts and that his publishers were not motivated by purely charitable intentions. But the inquiry does not end there. We do not read Section 107(1) as requiring us to make a clear-cut choice between two polar characterizations, "commercial" and "non-profit." Were that the case, fair use would be virtually obliterated, for "[a]ll publications presumably are operated for profit...." *Koussevitzky v. Allen, Towne & Heath*, 188 Misc. 479, 483, 68 N.Y.S.2d 779, 783, *aff'd*, 272 App.Div. 759, 69 N.Y.S.2d 432 (1st Dept.1947), *quoted in Rosemont Enterprises*, 366 F.2d at 307. The commercial nature of a use is a matter of degree, not an absolute, and we find that the educational elements of *Rachel Weeping* far outweigh the commercial aspects of the book. While *Rachel Weeping* involved some commercial aspects, it was first and foremost an essay expressing a certain point of view on the abortion issue. With sales of 6,000 copies, it was hardly a commercial blockbuster and, by all indications, was never intended as such. Of course, even a minimal level of commercial use weighs against a finding of fair use, but whether it affects the ultimate determination depends on the totality of factors.

**2. *The Nature of the Copyrighted Work***

■ The second factor to be considered is the nature of *Pregnant by Mistake*. As we have noted, the book is a collection of verbatim interviews and, in the district court's words, "essentially reportorial in nature." We agree with Judge Brieant, however, that *Pregnant by Mistake* cannot be characterized as the product of mere "diligence," like the index in *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 221 (D.N.J.1977). *Pregnant by Mistake*, like all interviews, contains elements of creative journalistic effort. "Creation of a nonfiction work, even a compilation of pure fact, entails

originality." *Harper & Row*, 105 S.Ct. at 2224. Nevertheless, Maxtone-Graham's book was essentially factual in nature, and, as the district court correctly noted, subsequent authors may rely more heavily on such works. As we have said in another context:

> Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works.... This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e.g., so "that the world may not be deprived of improvements, or the progress of the arts be retarded."

*Rosemont Enterprises*, 366 F.2d at 307 (quoting *Sayre v. Moore*, 105 Eng.Rep. 138, 139 (K.B.1801)). Like the biography, the interview is an invaluable source of material for social scientists, and later use of verbatim quotations within reason is both foreseeable and desirable.

### 3. *The Volume of Quotation*

We next turn to the quantitative assessment of the amount and substantiality of the excerpts in relation to the copyrighted work as a whole. There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use. In some instances, copying a work wholesale has been held to be fair use, *Sony Corp.; Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 203 Ct.Cl. 74 (1973), *aff'd* (per curiam), 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975), while in other cases taking only a tiny portion of the original work has been held unfair. Questions of fair use may turn on qualitative assessments. "One writer might take all the vital part of another's book, though it might be but a small proportion of the book in quantity." *Bramwell v. Halcomb*, 3 My. & Cr. (Ch.) 736, 738 (1837). In *Harper & Row*, the Supreme Court found that although the words quoted were an insubstantial portion of former President Ford's

manuscript, "the Nation took what was essentially the heart of the book." 105 S.Ct. at 2233 (quoting 557 F.Supp., at 1072). *See Meeropol v. Nizer*, 560 F.2d 1071 (copyrighted letters comprised less than one percent of infringing work but were featured prominently in promotional materials); *Roy Export Co. Establishment of Vaduz, Liechtenstein, Black Inc. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1145 (S.D.N.Y.1980) (jury could have found that taking 55 seconds of one hour, 29 minute film was qualitatively substantial), *aff'd*, 672 F.2d 1095 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

We agree with the district court that Burtchaell's inclusion of 4.3 percent of the words in *Pregnant by Mistake* in his own book is not incompatible with a finding of fair use. Burtchaell testified that he relied upon the verbatim quotations to make his own work more persuasive and because conducting his own interviews would have been impractical because he is a Catholic priest. Nor can it be said that Burtchaell took the heart of *Pregnant by Mistake*, since Maxtone-Graham's book consists of narratives by 17 women, and has no identifiable core that could be appropriated.

### 4. *Effect on the Market*

The final factor that we are required to consider is "the effect of the use upon the potential market for or value of the copyrighted work." The Supreme Court recently referred to the impact on the market as "undoubtedly the single most important element of fair use." *Harper & Row*, 105 S.Ct. 2234. The Court also had occasion to comment upon the market effect in *Sony Corp.* It said:

> Actual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage. Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of fu-

ture harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.

464 U.S. at 451, 104 S.Ct. at 793. Curiously, however, this bifurcated analysis was not employed by the Court when, only a year later, the issue of fair use resurfaced in *Harper & Row.* Despite the Court's finding that the Nation's stated purpose in publishing the excerpts was to scoop the forthcoming extracts in Time, the Court made no presumption of harm. Instead, it focused its inquiry on *actual* damages and assessed the likelihood of future harm. The Court held that "to negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" 105 S.Ct. at 2234–35 (quoting *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. at 793). Harm to derivative works must be taken into account, *see Meeropol v. Nizer,* 560 F.2d at 1070; *Roy Export v. Columbia Broadcasting System, Inc.,* 503 F.Supp. at 1145–46, as must any effect on the value of adaptation and serialization rights. 3 Nimmer Sec. 13.05(B).

■ In view of our conclusion that the noncommercial elements of *Rachel Weeping* overwhelm its commercial aspects, it is not clear that the dicta from *Sony Corp.* regarding the presumption of market harm governs here. Fortunately, we need not settle that issue here, for whether we presume harm, or search for proof of it, it is abundantly clear that *Rachel Weeping* poses no more than an insignificant threat of economic damage to Maxtone-Graham.[8] Although she has uncrystallized plans to publish a small second edition to satisfy requests for the book, *Rachel Weeping* has not affected these plans. Indeed, it is un-

thinkable that potential customers for a series of sympathetic interviews on abortion and adoption would withdraw their requests because a small portion of the work was used in an essay sharply critical of abortion. This conclusion is supported by our finding that the two works served fundamentally different functions, by virtue both of their opposing viewpoints and disparate editorial formats. Moreover, it is not beyond the realm of possibility that Burtchaell's book might stimulate further interest in *Pregnant by Mistake.* Nor do we believe Maxtone-Graham can credibly argue that the use of the quotations has harmed potential markets for her work. She is unable to point to a single piece of evidence portending future harm, and the fact that *Pregnant by Mistake* was published a full decade before the appearance of *Rachel Weeping* makes any such claim far too speculative to sustain upon mere allegation.

### 5. Other Factors

■ The additional points raised by Maxtone-Graham do not affect our analysis of the fair use question. Although bad faith by the user of copyrighted material suggests unfairness, Burtchaell's decision to publish despite Maxtone-Graham's denial of permission does not deserve that characterization. Unlike *Harper & Row,* where materials were purloined and portions subsequently published, Burtchaell obtained *Pregnant by Mistake* through legitimate channels and made repeated attempts to obtain permission to quote from it. He was willing to pay the customary price, and, in fact, did so for the rights to quote from *The Ambivalence of Abortion.* Burtchaell should not be penalized for erring on the side of safety.

---

**8.** We also note that *Pregnant by Mistake* was out of print when *Rachel Weeping* was published. While this factor is not essential to our affirmance of the district court's finding of fair use, it certainly supports our determination. The legislative reports have provided some guidance on this issue:

A key, though not necessarily determinative, factor in fair use is whether or not the work is

available to the potential user. If the work is "out of print" and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case,....

S.Rep. No. 94–473, 94th Cong., 1st Sess. 64 (1965); H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 67 (1976), U.S. Code Cong. & Admin. News 1976, p. 5680.

Finally, appellant argues that there is a material dispute concerning her purpose in withholding permission. She maintains that she was honoring her pledge to the interviewees, while the district court suggests that she was engaging in a form of content-based censorship. We accept her version of the facts, but also note that the issue is, at best, marginally relevant to our inquiry.

## E. CONCLUSION

We find no genuine dispute on material issues of fact in this case, and conclude from our evaluation of the factors that the fair use defense was properly sustained as a matter of law. Burtchaell's use of *Pregnant by Mistake* was precisely the type of criticism of or comment on copyrighted materials anticipated by Section 107. The two books treated the same topic but served dissimilar functions, and it can hardly be said that *Rachel Weeping* emerged from "the facile use of the scissors" or supplanted *Pregnant by Mistake*. Burtchaell did portray some of the excerpts in a misleading light, but the errors alone are not egregious enough to invalidate the use. The commercial elements of the use were relatively minor, and appellant was unable to advance a colorable case demonstrating harm to the market for the copyrighted work. In addition, *Pregnant by Mistake* was largely factual, and was out of print when *Rachel Weeping* was published. Finally, borrowing 4.3 percent of the words of *Pregnant by Mistake* was not unfair.

Accordingly, we affirm the district court's grant of summary judgment in favor of defendants.