796 F.2d 200
 55 USLW 2138, 230 U.S.P.Q. 463, 1986
Copr.L.Dec. P 25,968
 MCA, INC.; Cass County Music Company; Kortchmar Music;
April Music, Inc.; BGO Music, Inc.; Sailor Music; Hudmar
Publishing Company, Inc.; Coolwell Music; Granite Music
Corporation; Brockman Music; Stygian Songs; and
Controversy Music, Plaintiffs-Appellees,
v.
Norma PARKS and Irene Parks, Defendants-Appellants.
 No. 85-5651.
 United States Court of Appeals,
Sixth Circuit.
 July 24, 1986.
 
 Jerry D. Winchester (argued), Corbin, Ky., for defendants-appellants.
 Kimberly K. Greene, Wyatt, Tarrant & Combs, Louisville, Ky., Edgar A. Zingman (argued), for plaintiffs-appellees.
 Before CONTIE and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 This appeal of a judgment of copyright infringement asks the musical question whether it is as true in 1986 as it was in 1942 that "we ... just need a nickel to feed that jukebox Saturday night"?[1] The district court answered this question in the negative, finding that the cost of operating a jukebox that is the sole source of music in a roller-skating rink now also includes the obligation of the defendants-owners of that skating rink to pay royalties to copyright holders whose songs are played on "that jukebox." Concluding that the district court correctly construed the copyright statute in finding a violation, we affirm.
 
 
 2
 * Plaintiffs-appellees in this consolidated action are owners of song copyrights and members of the American Society of Composers, Authors and Publishers (ASCAP).[2] The copyright owners sued defendants-appellants Norma, John and Irene Parks (the Parks),[3] the owners and operators of Gerry's Roller Skating Rink in Corbin, Kentucky (Gerry's), for infringement of rights granted them under the United States Copyright Act, 17 U.S.C. Secs. 101 et seq. (1982), as amended by Pub.L. 94-553, Title I, Sec. 101, 90 Stat. 2541 (Oct. 19, 1976). The facts are not in dispute, and the district court ruled in favor of the copyright owners on cross-motions for summary judgment. The parties agree that the record is sufficiently complete to permit resolution of this case on their respective motions.
 
 
 3
 Gerry's is located inside a building that also houses a concession stand, video games and the allegedly offending jukebox, which contains recordings of, inter alia, the copyright owners' copyrighted songs. Patrons pay no admission fee to enter the Parks's building, where they are free to play the video games or jukebox, purchase food or drink, or simply listen to the music. Upon entering the building, patrons may turn right to the concession area (where the jukebox and video games also are located), or left to the booth where skating tickets are sold. The skating area is immediately ahead of the entrance, through a set of double doors. Patrons who wish to skate pay a $2.00 "skating fee," plus an additional $.50 if they rent skates.
 
 
 4
 Anyone in the building may, by depositing coins, play the jukebox, which is owned and operated by an outside organization. Music emanates from the jukebox itself, as well as from six large speakers that are inside and surround the skating area. Music from the jukebox provides the only accompaniment to skaters, there being no organ or other source of music. Thus, unless someone plays the jukebox, the skaters skate without music, and in her deposition, Norma Parks indicated that on some nights this occurs.
 
 
 5
 After consideration of the parties' briefs, depositions and affidavits, the court determined that Gerry's did not qualify for the so-called jukebox exemption from Copyright Act liability. 17 U.S.C. Sec. 116 (1982). This section relieves "the proprietor of the establishment in which the public [jukebox] performance takes place," 17 U.S.C. Sec. 116(a)(1), from liability for copyright infringement as long as the jukebox "is located in an establishment making no direct or indirect charge for admission." 17 U.S.C. Sec. 116(e)(1)(B). The court based its decision on the legal conclusion that "the charging of a skating fee constitutes a direct or indirect charge for admission," reasoning that the use of the jukebox was "closely related" to skating, the "primary purpose" of the establishment. MCA, Inc. v. Parks, Nos. 83-163/84-185, mem. op. (E.D.Ky. June 13, 1985). The district court therefore enjoined the Parks from further use of the jukebox in their establishment until they obtained an ASCAP license and began paying royalties to these plaintiffs. The court also awarded damages ($3,000.00) for past infringements and attorney's fees ($4,457.50) and costs in connection with the litigation. On appeal, the Parks contend that the district court erred in concluding that their establishment is not entitled to the jukebox exemption, and also challenge the award of attorney's fees.
 
 II
 
 6
 The principal issue on appeal is the validity of the district court's conclusion that Gerry's is "an establishment making ... a direct or indirect charge for admission." 17 U.S.C. Sec. 116(e)(1)(B). Since none of the facts are in dispute, the question is one simply of law.
 
 
 7
 The legislative history to the 1976 amendments to the Copyright Act reveals that Sec. 116 represented a compromise between the previous statute and the legislation preferred by ASCAP and its members. The prior statute contained an absolute exemption from copyright liability arising from any use of a jukebox, "unless a fee is charged for admission to the place where such reproduction or rendition occurs." H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 1, 112, reprinted in 1976 U.S. Code Cong. & Ad. News 5659, 5727. The House report accompanying the 1976 amendments indicates that "[n]o provision of the present law has attracted more heated denunciations and controversy than the so-called jukebox exemption." Id. Accordingly, the amended statute retained the exemption only for proprietors of establishments where jukeboxes are played (not for the owners of the jukeboxes), and then only if no "direct or indirect" admission fee is charged.
 
 
 8
 Under current law then, the owner of the jukebox in question is liable for license fees and royalties to the appropriate ASCAP members; but the Parks would be liable only if their "skating fee" were regarded as a direct or indirect admission charge.
 
 
 9
 The legislative history provides only a little guidance into what Congress meant by "direct or indirect charge for admission." Explaining the language, the committee report indicates that the exemption would not cover "establishments making cover or minimum charges, and those 'clubs' open to the public but requiring 'membership fees' for admission." Id. at 5729.
 
 
 10
 This explanation appears clearly to exempt most establishments such as diners and restaurants, barber and beauty shops, stores and shopping malls, and video and pinball arcades. Such establishments almost never charge "direct" admission fees, and it would render the exemption meaningless to describe the food, gaming or cosmetology charges as "indirect" admission fees. The copyright owners concede as much in their brief.
 
 
 11
 Equally clearly, the exemption would not cover taverns, nightclubs, social clubs or restaurants if they required patrons to pay an admission fee at the door, or if they otherwise added an entertainment "cover" or "minimum" charge to food and drink bills. At least one district court case has imposed jukebox liability on this kind of establishment. Blendingwell Music, Inc. v. Moor-Law, Inc., 612 F.Supp. 474 (D.Del.1985) (owner of bar featuring live music held liable for jukebox use on nights when admission was charged to hear the live band). The case is easily distinguished, because there is no question that the bar in Moor-Law was charging a direct admission fee; however, in the case sub judice, we are not concerned with construction of the "direct" admission charge language in the statute. The copyright owners' arguments notwithstanding, the "skating fee" at issue plainly is not a "direct" charge for admission, since it is uncontested that persons are admitted to Gerry's without payment of the fee. Our task, rather, is to devise a standard for measuring when a fee--charged by an establishment that concededly admits persons without charge--should be treated as an "indirect charge for admission."
 
 
 12
 In formulating this standard, we lack the benefit of prior judicial decisions.[4] We are guided by the legislative history, which clearly indicates that a "cover" or "minimum" entertainment charge at a tavern or restaurant amounts to an indirect admission charge. Likewise, we agree with the Parks that, as the copyright owners concede, charges for food and drink in an ordinary bar or restaurant would not amount to an indirect admission charge. Such an expansive reading of the statute would effectively eliminate the jukebox exemption, a result plainly not contemplated by Congress.
 
 
 13
 The standard for identifying an "indirect" admission charge must take account of these two extremes. If the purported admission fee is more clearly analogous to a simple charge for food or drink, then it will not impose copyright liability on the proprietor of the establishment; however, if the charge is more properly characterized as a cover or minimum, the jukebox exemption will not apply. In other words, when an establishment arguably exempt under Sec. 116 charges for an item, be it food, drink or some service, that charge will constitute an "indirect charge for admission" only if the nexus between the jukebox music and the purported "admission" charge is immediate and direct, so close as to be in the nature of a "cover" or "minimum" entertainment charge.
 
 
 14
 Determining which of these extremes--mere food or drink, or a "cover" charge--the "skating fee" charged by Gerry's most closely resembles is no easy task. Like a restaurant, Gerry's provides, for a charge, an item desired by its patrons, who pay nothing to enter the establishment. However, the copyright owners argue, and the district court concluded, that this case can be distinguished from the restaurant case because here, the music is "closely related" to the business of the skating rink. The argument must go: while consumers choose to patronize a restaurant or bar based on the cost and quality of food and drink, service and ambiance, consumers generally choose to patronize a skating rink to skate to music. This argument would not necessarily be in disagreement with Justice Holmes's observation, made in construing an earlier incarnation of the Copyright Act, that patrons of a restaurant often make their choice seeking "a repast in surroundings that to people having limited powers of conversation, or disliking the rival noise, give a luxurious pleasure not to be had from eating a silent meal." Herbert v. Shanley, 242 U.S. 591, 595, 37 S.Ct. 232, 233, 61 L.Ed. 511 (1917). But as we have already observed, when a court seeks to characterize a fee as an indirect admission charge, the nexus between the purported "admission charge" and the music on the jukebox must be closer than a simple interest in listening to music while dining or drinking.
 
 
 15
 We are satisfied that such a nexus exists in this case. Although there was testimony that on occasion, patrons at Gerry's have skated without the accompaniment of music from the jukebox, skating at a skating rink, like dancing at a dance hall, is an activity traditionally and usually associated with musical accompaniment. It seems undeniable that it was the well-known preference of skaters for such accompaniment that led the Parks to position all six of the jukebox's external speakers immediately around the perimeter of the skating area, with only the speaker that is a physical part of the jukebox itself even arguably aimed at providing music outside the skating area.
 
 
 16
 Under these circumstances, we think the nexus between the music and skating at Gerry's may not be "essential," as argued by the copyright owners; but it is far closer than any similar relationship between music and dining at a tavern or restaurant. There is little doubt that the absence of jukebox music would more dissuade the average roller skater from attending Gerry's than the average restaurant goer from visiting a similarly silent eating establishment. Because the close nexus between the skating charge and the music at Gerry's so nearly resembles that between a "cover" charge and the entertainment "covered" by that charge, we hold that the "skating fee" charged by Gerry's constitutes an "indirect charge for admission" within the meaning of the statute. It follows that the district court correctly found the Parks to be in violation of the Copyright Act.
 
 III
 
 17
 The Parks also argue that even if the judgment against them stands, they should not have been required to pay over $4,000.00 in attorney's fees.
 
 
 18
 The Copyright Act permits a trial court, in its discretion, to award attorney's fees to the prevailing party. 17 U.S.C. Sec. 505 (1982). While the statute on its face imposes no additional requirements, the Ninth Circuit has held that attorney's fees may be awarded under the Copyright Act only upon a finding of bad faith. Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc., 777 F.2d 485, 493 (9th Cir.1985). Other circuits are not in agreement, and the Eleventh Circuit has specifically held that the plain statutory language imposes no such requirement. Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 832 (11th Cir.1982). See also Lieb v. Topstone Industries, Inc., 788 F.2d 151, 154-56 (3d Cir.1986) (noting circuit split on necessity of finding bad faith, and suggesting that district courts exercise "an even-handed approach," relying on several factors including frivolousness, motivation, objective unreasonableness, and the need in particular circumstances for compensation and deterrence).
 
 
 19
 The proper standard for an award of an attorney's fees is not, however, before us in this case. At oral argument, counsel for the Parks was repeatedly questioned as to whether he contended that some "bad faith" standard should be adopted by this court:
 
 
 20
 The Court: I guess we can glean from what you're saying that they [copyright owners] have to show bad faith or something more than just that you're wrong in order to get fees?
 
 
 21
 Counsel: No, they can show we're wrong....
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 The Court: Well then are you conceding that if they win on the merits, they also win on the attorney's fees?
 
 
 25
 Counsel: They should be entitled to some sort of attorney's fees.
 
 
 26
 The Court: Alright, that solves that.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 Counsel for the Parks further conceded that he did not challenge the reasonableness of the awards in this case. Rather, counsel admitted that his only quarrel was with the statutory scheme, which, he argued, might permit copyright owners, by repeated visits to an offending establishment, to aggregate a large number of "violations," and thereby increase their damages and attorney's fees for essentially the same violation. However, counsel did not even contend that such compounding of violations occurred in this case. Thus, we need not consider whether such action would call for some narrowing of the attorney's fees portion of the statute.
 
 
 30
 In light of these concessions from the Parks's counsel, we need not, and expressly do not, reach the question of the proper standard to be applied by a trial court in awarding attorney's fees under Sec. 505 of the Copyright Act. While the case might otherwise have presented an appropriate vehicle for an answer to this question, our adversary system of justice forbids us to resolve issues not contested by the parties. Since the Parks have conceded the propriety of this award of attorney's fees if the trial court correctly found a violation; and since we have already determined that the trial court was correct in this regard, we hold that the award of attorney's fees was proper under the circumstances of this case.
 
 
 31
 Accordingly, we Affirm the judgment of the district court in all respects.
 
 
 
 [1]
 Al Stillman and Paul McGrane, "Jukebox Saturday Night" (1942)
 
 
 [2]
 ASCAP is a performing rights licensing organization that licenses users of copyrighted music and distributes royalties to its members, including these plaintiffs. See generally Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 4-6, 99 S.Ct. 1551, 1554-55, 60 L.Ed.2d 1 (1979) (describing licensing and royalty procedures)
 
 
 [3]
 The original complaint named as defendants only John and Norma Parks. On April 20, 1984, the plaintiffs filed an amended complaint adding Irene Parks as a party defendant. Claims against defendant John Parks were dismissed on September 11, 1984
 
 
 [4]
 Although the Fourth Circuit, in an unpublished decision, has imposed copyright liability on essentially identical facts, BGO Music, Inc., v. Pee Bee Investments, Inc., 785 F.2d 304 (4th Cir.1986), aff'g No. 83-1166, slip op. (S.D.W.Va. Feb. 1, 1985), the rules of our court discourage us from treating that decision as authority. See Sixth Circuit Rule 24(b)