**HI-TECH VIDEO PRODUCTIONS, INC., Plaintiff,**

**v.**

**CAPITAL CITIES/ABC, INC., Defendant.**

**No. 1:90–CV–1015.**

United States District Court, W.D. Michigan, S.D.

May 18, 1992.

James M. Hunt, Graff & Hunt, Traverse City, Mich., for plaintiff.

Herschel P. Fink, Mark J. Ringes, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for defendant.

## OPINION

ROBERT HOLMES BELL, District Judge.

This is a copyright infringement action. Plaintiff, Hi–Tech Video Productions, Inc. ("Hi–Tech"), alleges that defendant, Capital Cities/ABC, Inc. ("ABC"), committed a willful infringement by using, without permission, portions of Hi–Tech's copyrighted video in ABC's "Good Morning America" ("GMA") program on June 8, 1990. In response, ABC does not dispute the unauthorized use. Rather, it advances two contentions: (1) that its use was privileged under the "fair use" doctrine and (2) alternatively, that its use merely amounted to "innocent infringement." This Court, having jurisdiction over the action pursuant to 28 U.S.C. § 1338, held a bench trial on November 27, 1991 and December 12, 1991 to settle the contentions. The following opinion contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

### I.

### A.

Hi–Tech, based in Traverse City, Michigan, is an independent video production company. It is solely owned by Stan Akey ("Akey"), who has been in charge of its video productions since the birth of the company three years ago. Hi–Tech produces, among other things, travelogue videos, called "video postcards," of various regions of Michigan. These videos highlight some of the tourists attractions in the State. They are distributed to various outlets in northern Michigan for sale as souvenirs.

ABC is a major television network. Headquartered in New York City, it is a "for-profit" corporation. ABC produces a myriad of commercial programs, which it broadcasts through its network affiliates across the country. One of these programs is 'Good Morning America' ("GMA"). It is a news and information program shown on the ABC stations each weekday morning. GMA has a variety of segments, including feature/weather reports. These feature/weather reports sometimes originate from far-flung locations.

### B.

In May 1990, Hi–Tech produced a travelogue video, entitled "Mackinac Island, Michigan: The Video" (the "video"). Akey and his production crew produced the video. At trial, Akey testified that they worked many days to produce the video.

The video attempts to capture the essence of Mackinac Island. According to its certificate of copyright registration, the video depicts "the legend, lore, histories, and present day life of Mackinac Island." The video conveys the message that visiting the Island is a unique experience. It is about 18 minutes long.

The video is packaged in a colorful, plastic video container. At the back side of the container, the following printed words appear: "For information on other videos please call or write: Hi–Tech Video Productions/1126 East Eighth Street/Traverse City, MI 49684/(616) 929–2323." There is, however, no copyright notice on the container. Nor is there such a notice on the cassette itself; nevertheless, the cassette does have a printed label, which reads as follows: "A Video Postcard/MACKINAC ISLAND/MICHIGAN/Hi–tech Video Productions."

The videotape begins with an introduction informing its viewers that the video is presented by "Hi–Tech Video Productions, Inc." No copyright notice follows immediately. A familiar copyright notice mark [1]

---

**1.** The validity of Hi–Tech's copyright notice is no longer at issue. That issue was resolved in favor of Hi–Tech by a bench ruling at trial.

does, however, appear at the "tail credits" portion of the tape. It reads as follows:

A Hi–Tech Video Productions Presentation. All materials copyrighted c 1990. All rights reserved.

On or about May 20, 1990, Hi–Tech began distributing the copies of the video to various commercial outlets in northern Michigan. Subsequently, Hi–Tech obtained its copyright registration, effective August 3, 1990.

### C.

In the meantime, GMA decided to send Spencer Christian, the program's weather reporter, on assignment to Mackinac Island on June 8, 1990. He would cover the Island's 41st Lilac Festival. He would also report weather from the Island.

In preparation, Donna Vislocky, then senior associate producer of GMA, was assigned to produce a short, pre-taped background video piece on the Island. The background piece would provide an introduction to Christian's live coverage.

Vislocky contacted various sources to gather materials for her background piece. Most important, she inquired about scenic video footages of the Island, which she could obtain and incorporate into her piece. Two days before the scheduled broadcast date, however, Vislocky had not obtained sufficient amount of quality footages to produce her piece. Concerned, she began to telephone a number of people for assistance. One of them was Sarah Bolger, executive director of the Mackinac Island Chamber of Commerce. Bolger was Vislocky's "contact person" on the Island.

What followed immediately thereafter is in dispute. According to Vislocky's deposition transcript, she told Bolger of her predicament. Bolger then told her: (1) that there were two videos on Mackinac Island, including Hi–Tech's video, that the Chamber of Commerce had commissioned; and (2) that Bolger could send her these videos for GMA's use.

Bolger's trial testimony, which is more credible,[2] was to the contrary. Bolger did not recall having any discussion with Vislocky regarding the shortage of background footages. Nor did Bolger believe that she had told Vislocky: (1) that Hi–Tech's video, which Bolger knew as an independent, commercial production, was commissioned by the Chamber of Commerce; and (2) that GMA could or could not use Hi–Tech's video, without first obtaining permission from Hi–Tech, for GMA's background piece.

Bolger did, however, send her some printed materials and the videos via overnight mail. She did not enclose any cover letter or explanatory note in the mail package. Bolger testified that when she sent the package, she believed that GMA would use the videos, as well as other enclosed materials, to prompt questions for the guest who would appear with Christian on GMA.

Upon receipt of the materials, Vislocky quickly reviewed the videos. After screening the first 10–12 minutes of Hi–Tech's 18–minute video, she found that certain portions of the video would be helpful to her background piece. She wanted to incorporate those portions to her piece. Vislocky then stopped reviewing the Hi–Tech's video, even though a complete, routine review, at a fast forward speed, would have taken less than a minute. She therefore did not see Hi–Tech's copyright notice at the "tail credits" portion of the tape.

Next morning, at about 7:45 a.m., Christian told the GMA audience that he was reporting from Mackinac Island. The background piece, as produced by Vislocky, ran for about 65 seconds, with Christian narrating. Not unlike the video, the background piece capsulized the essence of Mackinac Island. After the background piece, Christian explained that the Island was celebrating its 41st Lilac Festival. He then conducted a live interview with Bolger about the Festival.

---

**2.** This credibility determination is based on the Court's evaluation of the witness Bolger's demeanor, as well as her testimony itself. The Court could not examine witness Vislocky's demeanor, since she did not appear at trial.

### D.

At trial, the parties agreed that approximately 38 seconds of the visual part of the background piece, which aired on June 8, 1990, had been taken from Hi–Tech's copyrighted, 18–minute video without permission (about 3.5 percent of the video). To put it somewhat differently, nine out of 172 separate scenes or shots from the video were taken by GMA (about 5 percent).

Hi–Tech also acknowledged that it sustained no actual damages resulting from GMA's unauthorized use. On the other hand, ABC saved, at most, about $1,140 by using Hi–Tech's video excerpts. According to Vislocky's deposition transcript, without Hi–Tech's excerpts, ABC would have had to spend approximately that amount to buy 38 seconds of the background stock footage of Mackinac Island from National Geographic Film Library (at the $30 per second standard footage rate for United States television). Hi–Tech offered no similar estimate.

### II.

At trial, ABC did not dispute its unauthorized use of Hi–Tech's video on June 8, 1990. Rather, ABC advanced two principal arguments: that its use was privileged under the "fair use" defense; and that, alternatively, its use constituted an "innocent infringement." Upon consideration of all the evidence and appraisal of the demeanor of the witnesses, the Court finds that ABC has failed to sustain both arguments.

### A.

The Court begins with the fair use defense. Fair use is an exception to copyright law. It confers a "privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). Courts developed the doctrine to "resolve tensions between the ends of copyright law, public enjoyment of creative works, and the means chosen under copyright law, the conferral of economic benefits upon creators of original works." *Pacific & Southern Co. v. Duncan*, 744 F.2d 1490, 1495 (11th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985). It permits "courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*, 621 F.2d 57, 60 (2d Cir.1980).

The fair use doctrine is now codified in 17 U.S.C. § 107. It has two parts. The first section, the preamble, sets forth a number of examples of what could constitute fair use: "Notwithstanding the provisions of section 106 ..., the fair use of a copyrighted work ... for purposes such as criticism, comment, [or] news reporting, ... is not an infringement of copyright." *Id.* In the second part, the section enumerates four factors that a court must further consider in determining whether a particular use is a fair use. They are as follows: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.*

These nonexclusive statutory factors, however, serve only as "a guide to courts considering fair use." *Weissmann v. Freeman*, 868 F.2d 1313, 1323 (2d Cir.1989), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989). Moreover, the terms of § 107 provide no specific instruction as to how courts should apply and weigh each of the factors. *See* M. & D. Nimmer, 3 *Nimmer on Copyright* § 13.05 at 13–83 (1991). By contrast, the legislative history of § 107 is instructive; it directs courts to examine each case individually with an "equitable rule of reason" analysis. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448

n. 31, 104 S.Ct. 774, 792 n. 31, 78 L.Ed.2d 574 (1984).

■ Accordingly, courts must consider the facts of each case in light of these factors and other equitable considerations, such as good faith, *see Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562–63, 105 S.Ct. 2218, 2231–32, 85 L.Ed.2d 588 (1985), and then conduct a "sensitive balancing of interests." *Sony Corp.,* 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40. This Court turns to such an examination.

1. *Factor one: Purpose and character of the use*

The purpose and character of the use must first be considered. At the outset, the Court finds that ABC's use fits within the "news reporting" category of § 107. Though not a traditional news coverage, *see Wainwright Secur., Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 96 (2d Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), no one can seriously dispute that ABC's use was not a part of a news feature coverage of the Island's annual Lilac Festival. A one-time viewing of GMA's entire segment on the Festival is sufficient to lead to that finding.

■ But that does not, by itself, allow ABC to claim the first factor in its favor. Regardless of whether a particular use falls within the illustrative categories set forth in the preamble of § 107, courts must turn to each of the ensuing four factors. *See New Era Publications International, ApS v. Carol Pub. Group,* 904 F.2d 152, 156 (2d Cir.) (noting that the Supreme Court in *Harper & Row* did not end its analysis of the first factor once it determined that the allegedly infringing use, news reporting, was listed as an example of fair use), *cert. denied,* —— U.S. ——, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990); *Quinto v. Legal Times of Washington, Inc.,* 506 F.Supp. 554, 560 (D.D.C.1981) ("Use of copyrighted material in a news story may constitute a fair use, but only if the court deems it so after considering the four factors listed in the statute.").

In particular, the first factor requires that there must be a determination on whether the use was of a commercial nature or was for a nonprofit educational purpose. 17 U.S.C. § 107(1). Indeed, if the copyrighted work were used for a commercial or profit-making purpose, the use would presumptively be unfair. *Sony,* 464 U.S. at 449, 104 S.Ct. at 792; *see also Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1262 (2d Cir.1986) (noting that although the final determination depends on the totality of factors, "even a minimal level of commercial use weighs against a finding of fair use"), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). As the Supreme Court added, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231.

Here, the Court finds that ABC's use was of a commercial nature. Common knowledge suggests that ABC stood to gain at least indirect commercial benefit from the ratings boost which it hoped to gain by running an interesting segment, such as this Lilac Festival segment, in the GMA program. Moreover, ABC does not claim that its unauthorized use was for a nonprofit, educational purpose. ABC merely asserts that no identifiable profit was realized from this use. That is beside the point. As noted, as long as the unauthorized user stood to profit, whether actualized or not, from its exploitation of the copyrighted work, as here, its use must be considered commercial.

On balance, then, the first factor favors Hi–Tech.

2. *Factor two: Nature of the copyrighted work*

■ Turning to the second factor, the nature of the copyrighted work must be examined. Under this inquiry, courts ask whether the work is factual and informational, *see New Era,* 904 F.2d at 157, or "creative, imaginative, and original."

*MCA, Inc. v. Wilson,* 677 F.2d 180, 182 (2d Cir.1981). If the work is factual and informational, the scope of fair use is greater because "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row,* 471 U.S. at 563, 105 S.Ct. at 2232. In addition, courts consider whether the copyrighted work "represented a substantial investment of time and labor made in anticipation of a financial return." *MCA, Inc. v. Wilson,* 677 F.2d at 182; *Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1154 (9th Cir.1986).

In this case, the Court initially finds that the video is factual and informational. It purports to be a travelogue video on Mackinac Island. Upon viewing, it is clear that the video attempts to capture the essential Mackinac Island. The video indeed highlights some of the most memorable things that a first-time visitor to the Island can experience.

But the video is more than just that. It is Hi–Tech's brand of Mackinac Island. A creation of Akey and his production crew's hard work, the video is not a jumble of video film clips, assembled with a moment's notice. From various film footages, Hi–Tech had apparently culled the best shots to make an appealing, story-telling video, depicting the Island's natural beauty, history, landmarks, events, and other features. Hi–Tech also produced the video as a commercial enterprise; upon production, Hi–Tech distributed the copies of the video to outlets in northern Michigan for sale. In other words, the evidence suggests that the video is a product of creativity, imagination, and originality, as well as a fruit of hard work, with an expectant view of some financial return.

Considering the totality of circumstances, then, the Court finds that the factual and informational element of the video is outweighed by other relevant qualities. The second factor tips in favor of Hi–Tech.

3. *Factor three: Amount and substantiality of the work used*

Next, courts must consider the amount and substantiality of the copyrighted expression that has been used. *Salinger v. Random House, Inc.,* 811 F.2d 90, 97 (2d Cir.), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). In undertaking this inquiry, "[t]here are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Maxtone–Graham,* 803 F.2d at 1263. However, where a substantial percentage of the copyrighted work is used, *see, e.g., Marcus v. Rowley,* 695 F.2d 1171, 1177 (9th Cir.1983) (50%); *Quinto,* 506 F.Supp. at 560 (92%), or where the copied material was "essentially the heart of" the copyrighted work, courts have found no fair use. *New Era,* 904 F.2d at 158; *see Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 844 (11th Cir.1990) ("a small degree of taking is sufficient to transgress fair use if the copying is the essential part of the copyrighted work").

Here, no one disputes that the amount of the expression used was quantitatively small. ABC used approximately 38 seconds out of the video's total 18 minutes running time, or 3.5 percent. To put it differently, ABC used only nine out of the video's 172 separate scenes or shots, or 5 percent of the total.

A numerical accounting, however, does not tell the whole story. While the copied material is small, it appears, from viewing the entire video, that ABC used "at least an important ingredient," *Salinger,* 811 F.2d at 99, if not the heart, of the copyrighted work. ABC took nine of the arguably best scenes, a representative group of shots of the Island, from the video. *See New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc.,* 215 U.S.P.Q. 755, 757, 1981 WL 1374 (D.Mass.1981) (using short excerpts of "highlights" considered qualitatively substantial). Indeed, it could be said that, without these nine shots, the video is probably not worth watching.

The Court therefore finds that the third factor favors Hi–Tech.

4. *Factor four: Effect on the market*

The fourth factor is the effect on the potential market for or value of the copy-

righted work. It is "the single most important element of fair use." *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233. As the Second Circuit explained:

> Under this factor a balance must be struck between the benefit gained by the copyright owner when the copying is found an unfair use and the benefit gained by the public when the use is held to be fair. The least adverse impact on the owner, the less public benefit need be shown to sustain non-commercial fair use. It is plain that where a use has no demonstrable impact on a copyright owners' potential market, the use need not be prohibited to protect the artist's incentive to pursue his inventive skills. *Yet where the use is intended for commercial gain some meaningful likelihood of future harm is presumed.*

*Rogers v. Koons,* 960 F.2d 301, 311–12 (2d Cir.1992) (emphasis added).

As noted above, ABC's use in this case was of a commercial nature. Therefore, despite Hi–Tech's acknowledgment that it suffered no actual damages from ABC's unauthorized use, the likelihood of future harm is presumed. Furthermore, even if ABC's use had not been of a commercial nature, deprivation of a would-be licensing fee, which a copyright holder would have earned for the unauthorized use, constitutes sufficient harm for purposes of evaluating this factor. *See Financial Information, Inc. v. Moody's Investors Service, Inc.,* 751 F.2d 501, 510 (2d Cir.1984) (citing cases), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987).

Thus, the Court also finds that the fourth factor favors Hi–Tech.

5. Other considerations

■ Finally, other non-statutory considerations may be reviewed in considering whether a particular use is a fair use. For example, "bad faith by the user of copyrighted material [that] suggests unfairness" or "prejudice suffered by [the alleged infringer] as the result of [the copyright holder's] unreasonable and inexcusable delay in bringing the action," *New Era,* 904 F.2d at 160, has been considered.

Here, the Court finds that while ABC's use was unjustified under the circumstances, the evidence of ABC's bad faith, in this context, has not been clearly shown. Nor does it appear that ABC suffered any prejudice.

In sum, the Court concludes that four of the five relevant factors favor Hi–Tech. As such, ABC's fair use defense cannot stand. ABC is liable for the unauthorized use of Hi–Tech's video under 17 U.S.C. § 501.

B.

(1)

The Court must then turn to the damages issues. In general, when a copyright owner elects to recover, statutory damages, instead of actual damages and profits, for unauthorized use, as here, a court may not award less than $500 or more than $20,000. 17 U.S.C. § 504(c)(1). Within these limitations, "the court's discretion and sense of justice are controlling." *D.C. Comics Inc. v. Mini Gift Shop,* 912 F.2d 29, 34 (2d Cir.1990) (quoting *L.A. Westermann Co. v. Dispatch Printing Co.,* 249 U.S. 100, 106–07, 39 S.Ct. at 195–96, 63 L.Ed. 499 (1919)); *see also Harris v. Emus Records Corp.,* 734 F.2d 1329, 1335 (9th Cir.1984).

■ But these limitations are not absolute. For example, if a court finds that an infringement was committed "willfully," the court has discretion to award as much as $100,000 in statutory damages for each infringement. 17 U.S.C. § 504(c)(2). In this context, " 'willfully' means with knowledge that defendant's conduct represents an infringement." *Fitzgerald Pub. Co. v. Baylor Pub. Co.,* 807 F.2d 1110, 1115 (2d Cir.1986) (citing 3 *Nimmer on Copyright* § 14.04[B][3] at 14–28 (1986)). Plaintiff must establish that the defendant had either "actual or constructive knowledge" of its infringing conduct. *Id.* To prove constructive knowledge, courts have generally required the copyright owner to show that the "infringer has acted in reckless disregard of the copyright owner's right." *See, e.g., Video Views, Inc. v. Studio 21, Ltd.,*

925 F.2d 1010, 1020 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991); *RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,* 845 F.2d 773, 779 (8th Cir.1988).

On the other hand, if a court finds that an infringement was committed "innocently," the court has discretion to award an amount below the statutory amount, but not less than a sum of $200. 17 U.S.C. § 504(c)(2). To prove innocent infringement, the defendant must show that he "was not aware and had no reason to believe" that his acts constituted an infringement. *Id.* Defendant "must not only establish its good faith belief in the innocence of its conduct, [but] it must also show that it was reasonable in holding such a belief." *Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1336 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991). In determining whether or not an infringing act was innocent, courts may examine whether the infringed work had a copyright notice. *See D.C. Comics Inc.,* 912 F.2d at 35. Also, courts may consider the level of sophistication of the defendant in business. *Id.* at 35–36.

The "willfulness" exception applies in this case. Contrary to ABC's claim of innocence, the Court finds that ABC's infringement was willful. The evidence shows that ABC, though apparently lacking actual knowledge, had nonetheless acted in reckless disregard of the copyright owner's right.

The evidence demonstrates that on the eve of the scheduled broadcast date, ABC obtained Hi–Tech's video from the Mackinac Island Chamber of Commerce without any express permission for ABC's broadcast use; that upon receipt, an experienced ABC employee—Vislocky, a senior associate producer of GMA—ignored the packaging of Hi–Tech's video, which bore Hi–Tech's name, address, and telephone number, and the video cassette's label, which also bore Hi–Tech's name, and declined to inquire further about the legality of using Hi–Tech's video; that, despite these ample indications suggesting caution, Vislocky de-

cided that she could copy portions of the video for ABC's use only upon reviewing about the first two-thirds of the tape, insofar as not to view Hi–Tech's copyright notice at the "tail credits" portion of the tape; and that Vislocky, for reasons best known to her, failed to conduct even a routine fast-forward review of the entire tape—which, she admitted at her deposition, would have taken no more than a minute—to ascertain whether there was a copyright notice at the "tail credits" portion of Hi–Tech's video.

Accordingly, the Court finds that ABC acted in reckless disregard of Hi–Tech's copyright.

(2)

Next, the Court must determine the amount of statutory damages that should be awarded. Because the Court found that ABC's infringement was willful, the maximum amount of statutory damages could reach a sum of $100,000. 17 U.S.C. § 504(c)(2). Nonetheless, the district court retains a wide and almost exclusive discretion in setting the amount of statutory damages. *See Video Views,* 925 F.2d at 1017; *Fitzgerald Pub.,* 807 F.2d at 1116.

In exercising that discretion, courts may consider a number of factors: (1) the expenses saved and the profits reaped by the infringers; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on the defendant and others besides the defendant; and (5) whether the defendant's conduct was innocent or willful. *Fitzgerald Pub.,* 807 F.2d at 1117 (collecting cases).

Here, upon consideration of these factors, the Court concludes that an award of $3,420 is just. From Vislocky's deposition transcript, it appears that ABC saved, at most, approximately $1,140—the cost of buying 38 seconds of National Geographic Film Library's stock footage of Mackinac Island—for its one-time infringement. However, ABC claims that it reaped no identifiable profits from its unauthorized use. Hi–Tech, on the other hand, has not shown any revenues that it may have lost. Equally missing is Hi–Tech's estimate of

the value of its copyright. Still, a defendant who has willfully violated the copyright laws must be "put on notice that it costs less to obey the copyright laws then to violate them." *International Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir.1988). This teaching is particularly applicable where, as here, the infringer is a sophisticated one, familiar with the fundamentals of the copyright laws. For deterrence of future violations, then, the Court assesses an additional amount of $2,280, making the total award three times the maximum amount that ABC would have had to expend to comply with the copyright laws. *See International Korwin*, 855 F.2d at 383 (noting that deterrence is a legitimate consideration in a willful infringement case). The Court does not believe that a larger award is warranted under the circumstances.

### C.

■ Finally, Hi–Tech requests attorney's fees and costs. Under the Copyright Act, a court may in its discretion award reasonable attorney's fees to the prevailing party. 17 U.S.C. § 505; *MCA, Inc. v. Parks*, 796 F.2d 200, 204 (6th Cir.1986). The statute also provides that a court, exercising its discretion, may award full costs to the prevailing party. 17 U.S.C. § 505.

There is, however, a split in the circuits on when reasonable attorney's fees may be awarded under this statute. The Sixth Circuit explained:

> While the statute on its face imposes no additional requirements, the Ninth Circuit has held that attorney's fees may be awarded under the Copyright Act only upon a finding of bad faith. *Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 493 (9th Cir.1985). Other circuits are not in agreement, and the Eleventh Circuit has specifically held that the plain statutory language imposes no such requirement. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 832 (11th Cir.1982).

*MCA, Inc. v. Parks*, 796 F.2d at 204–05. *See also Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 154–55 (3d Cir.1986) (further discussing the split in the circuits). The Sixth Circuit, moreover, has not yet taken a position on the issue. *See MCA, Inc. v. Parks*, 796 F.2d at 205. Nor has some other circuits. *See, e.g., Walt Disney Co. v. Powell*, 897 F.2d 565, 568 n. 6 (D.C.Cir.1990) (declining to take sides on the controversy); *Applied Innovations, Inc. v. Regents of University of Minnesota*, 876 F.2d 626, 638 (8th Cir.1989) (same).

Similarly, this trial court need not take sides. Under the circumstances of this case, the Court concludes that reasonable attorney's fees should be awarded, even under the more stringent standard. First, having withstood ABC's two central attacks at trial, Hi–Tech is the "prevailing party" under § 505. *See Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir.1989) (defining the "prevailing party" under the Copyright Act). And second, because this Court found that ABC's infringement was willful, it may award reasonable attorney's fees even under the tougher standard. *See Chi–Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1230 (7th Cir.1991); *Walt Disney*, 897 F.2d at 568. Accordingly, Hi–Tech may be awarded reasonable attorney's fees by submitting an appropriate, detailed affidavit.

For the same reasons, Hi–Tech's may also include its request for costs in its affidavit.

The Court need go no further.

### III.

In sum, the judgment is entered for the sum of $3,420 in favor of Hi–Tech and against ABC. Hi–Tech may submit an appropriate affidavit to recover reasonable attorney's fees and costs for prosecution of this action.