**PRINCETON UNIVERSITY PRESS, MacMillan, Inc. and St. Martin's Press, Incorporated, Plaintiffs,**

v.

**MICHIGAN DOCUMENT SERVICES, INC., and James M. Smith, Defendants.**

**No. 92–CV–71029–DT.**

United States District Court, E.D. Michigan, Southern Division.

June 9, 1994.

Ronald S. Rauchberg, Herman L. Goldsmith, Law Firm of Proskauer, Rose, New York City, James E. Stewart, J. Michael Huget, Law Firm of Butzel Long, Detroit, MI, Jon A. Baumgarten, Law Firm of Proskauer, Rose, Washington, DC, for plaintiffs.

Susan M. Kornfield, Law Firm of Bodman, Longley, Ann Arbor, MI, for defendants.

*ORDER ACCEPTING IN PART AND REJECTING IN PART MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

HACKETT, District Judge.

This matter is before the court on cross-motions for summary judgment and/or dis-

missal. The court has reviewed the file, the record, and the magistrate judge's report and recommendation and accepts in part and rejects in part the magistrate judge's recommendation. Objections to the report have been filed by both parties within the established time period. Responses to the objections have been filed by the opposing parties. All of these have been reviewed and considered by this judge.

The court hereby adopts the magistrate judge's report and recommendation in part as the findings and conclusions of this court. The court differs with the findings and conclusions of the magistrate judge only as they address the matter of willfulness and penalties to be imposed. Plaintiffs' motion for summary judgment is granted. Defendants' motions for summary judgment on infringement and statutory vagueness are denied.

The court adopts the following factual background as stated by the magistrate judge in the report and recommendation:

This is a copyright infringement case. The facts are not really in dispute. Plaintiffs are publishers of copyrighted works. Princeton Press is a not-for-profit entity; Macmillan and St. Martin's Press are for-profit corporations. Each plaintiff operates a permissions department that passes upon requests for permission to copy excerpts from that plaintiff's works. Plaintiffs generally charge a fee for allowing others the privilege of copying portions of their works, which fees are usually shared with the authors. Sometimes, plaintiffs will grant permission to copy an excerpt at no charge; other times they may deny permission altogether if, for example, the excerpt is so large that plaintiff believes the book should be published instead.

Defendant Michigan Document Services, Inc. (MDS) is a Michigan for-profit corporation; defendant James M. Smith is the president and sole stockholder of MDS. Defendants provide photo reproduction services to professors and students; specifically, they are in the business of selling "coursepacks." Coursepacks are compilations of academic materials, selected and arranged by professors, which are then assigned to the students in the professors' classes. They may include excerpts from books, journal articles, newspaper articles, course notes or syllabi, sample test questions, and reference to further works. Professors deliver their coursepack materials to MDS and provide information as to the number of students expected to enroll in the class. MDS creates a master copy of all of the materials in the coursepack, creates a table of contents, identifies excerpts by author and name of the underlying work, numbers the pages and then binds the copies together. Professors do not receive compensation for bringing their coursepacks to MDS; they are sold to the students enrolled in a particular course and are not sold to the general public.

At the start of the 1992 winter semester at the University of Michigan, defendants prepared and sold multiple copies of the three unauthorized anthologies in suit to students at their Ann Arbor store. The three anthologies, or coursepacks, included six excerpts photocopied from works owned by the three plaintiffs. The shortest excerpt copied by defendants was 17 pages. The longest was 95 pages. The other four excerpts ranged from 45 to 78 pages. Defendants' purpose was to profit from the sales of the anthologies. Defendants did not seek permission to copy any of the six excerpts which are the subject of this lawsuit, nor did they pay any royalties or permission fees for the use of the excerpts in suit before selling the three coursepacks to students.

The copying which is the subject of this litigation is but the tip of the iceberg: Although defendants did not retain records, they admit that they could have sold as many as 25,000 coursepacks in 1991 for approximately 700 different courses, and that they made coursepacks for a thousand different classes in 1992. Moreover, defendants' computer lists show that defendants copied at least 2,900 copyrighted excerpts in connection with the 1992 winter term at the University of Michigan (Ann Arbor), the time and place where the copying in suit occurred. These lists cover only one semester, at one of fourteen schools at which defendants admit they sell or have sold coursepacks. Defendant Smith has also publicly stated his "best

guess" that the six excerpts alleged in this case are part of a considerably larger group of 10,000 to 15,000 copyrighted excerpts copied each semester.

■ Plaintiffs have filed a motion for summary judgment contending that the operable facts are not in dispute and that they are entitled to a judgment of infringement as a matter of law, as well as injunctive relief, statutory damages and reasonable attorney fees. Defendants oppose summary judgment, basically contending that their coursepacks are a "fair use" of the materials under statutory and case law, and object to the relief requested.

In their objections to the report and recommendation of the magistrate judge, as well as in their various pleadings, the defendants raise numerous reasons and arguments why they should be permitted to use copyrighted materials without paying while realizing a profit for themselves. They argue that they are doing so because the practice has been widespread and on-going for 19 years, publishers have not been able to document sales loss, that their practice has not hurt the publishers, and that in essence everything that they are doing, they are doing for the students and professors for educational purposes.

Defendants apparently recognize that they are using copyrighted materials, and candidly admit that they are doing so without seeking permission from the publishers, although there are clear and relatively simple procedures in place for them to do so. They contend that they should be accorded the same rights, privileges and courtesies extended to students, and argue that they "stand in the shoes" of the students.

Defendants also are candid in admitting that the practice of not seeking permission from publishers has given them a market advantage because they are able to charge less for their services than their competitors charge. In making this argument, they acknowledge that other copy houses similarly situated recognize the copyrighted interests, the protected materials, the property of others, and pay the required copyright fee for use of copyrighted materials. The record is clear that the competitor copy service compa-

nies follow the procedures, get the required approval, and provide coursepack material to students. Some universities have taken it upon themselves to notify the defendants that what they are doing is not acceptable and violates copyright laws as they understand them, and that they will not be ordering coursepack materials from the defendants. Notwithstanding these facts, the defendants have continued for an extensive period of time to take and use the property of others for their own personal gain. They excuse all of this by further suggesting that they do not agree with the law and asserting that they interpret the law differently than appellate courts that have addressed copyright infringement, and legal scholars who have counseled them against their practice. They would argue that their efforts to determine the law for themselves would excuse their conduct as it might be deemed willful.

This court is compelled to see this practice for what it is. The defendant is taking the property of another without right or permission, using that property for personal gain. There simply is no excuse for this conduct. How often this court hears as an explanation for illegal conduct a statement or argument that "the law is wrong, so I just chose not to be bound by it." There are procedures to change the law; it is not to be violated.

Copyright law has been carefully drafted to accommodate the various needs, rights and interests of the parties. The Supreme Court explained the law as enacted:

> The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

*Sony Corp. v. Universal City Studios,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984).

As carefully developed in the report of the magistrate judge, notwithstanding the mo-

nopoly-like privileges of copyright, Congress has also limited those exclusive rights with a codification of the "fair use" doctrine:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or photorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyright work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and,
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Generally, as noted by the Court in *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985):[1]

> Section 107 requires a case-by-case determination whether a particular use is fair, and the statute notes four non-exclusive factors to be considered.

*Id.* at 549, 105 S.Ct. at 2224.

> Fair use is a mixed question of law and fact ... where the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court "need not remand for further factfinding but may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work."

*Id.* at 560, 105 S.Ct. at 2230 (citations omitted).

### Purpose and Character of the Use

■ In *Harper & Row*, the Supreme Court analyzed the four factors set forth in § 107. As to the purpose and character of the use, the Court stated:

> The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use.... The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.

*Id.* at 562, 105 S.Ct. at 2231.[2]

■ In addition to whether the use of the copyrighted material is for commercial or non-commercial purposes, the courts have looked to whether the use is productive or non-productive. That is, has the defendant re-packaged or purely copied for profit, or has the defendant, by way of creative input or interpretation, added value to the work. *See Basic Books v. Kinko's Graphics*, 758 F.Supp. 1522, 1530 (S.D.N.Y.1991). Still:

> The distinction between "productive" and "unproductive" uses may be helpful in calibrating the balance, but it cannot be wholly determinative.... Copying for commercial gain has a much weaker claim to fair use than copying for personal enrichment. But the notion of social "productivity" cannot be a complete answer to this analysis.

*Sony*, 464 U.S. at 455, fn. 40, 104 S.Ct. at 795, fn. 40.

In the instant case, the magistrate judge found, and this court agrees that we have pure copying for profit. Defendants argue that the use of the coursepacks by the professors and the students is educational. However, the "use" of the material men-

---

1. *Harper & Row* held that a political commentary magazine which scooped (first published) excerpts (300–400 words) of President Ford's memoirs relating to the pardon of former President Nixon, without permission of the author or magazine to whom he had sold his rights, was *not* engaged in a "fair use" of the material.

2. Infringement may be found even in the absence of profit for copying. *See Marcus v. Rowley*, 695 F.2d 1171 (9th Cir.1983); *Hi–Tech Video v. Capital Cities/ABC*, 804 F.Supp. 950 (W.D.Mich. 1992); and, *Encyclopedia Britannica v. Crooks*, 542 F.Supp. 1156 (W.D.N.Y.1982).

tioned in the statute refers to use by the alleged infringer, not the consumers of the material who in this case happen to be students. Thus, a balancing of the parties' interests as to the first factor weighs heavily against a finding of fair use.

### Nature of the Copyrighted Work

■ The second factor, the nature of the copyrighted work, also weighs against defendants. As a general rule, creative works are afforded greater protection by the fair use doctrine than are works of facts. *Acuff–Rose Music, Inc. v. Campbell*, 972 F.2d 1429, 1437 (6th Cir.1992). Most of the copyrighted materials from which the defendants copied excerpts in this case were original, interpretive works. Even though they were historical or educational and not fictional, this factor should not weigh in defendants' favor.[3]

### Amount and Substantiality of the Portion Used

■ The third factor under § 107 is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. The six excerpts relevant to this case contain from 17 pages to 95 pages copied, constituting from 5% to 30% of the authors' original works. They are truly "excerpts," and do not purport to be replacements for the original works. However, they are not insubstantial or incidental references. The statute requires an assessment of the portions used "in relation to the copyrighted work as a whole." Thus, defendants' argument as to how much (or little) copyrighted material was included in relation to the other materials in the coursepacks is irrelevant. As Judge Learned Hand was quoted in *Harper & Row:* "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." 471 U.S. at 565, 105 S.Ct. at 2233. This court is persuaded that the amount and substantiality of the excerpts copied by defendants in the instant case weigh against a finding of fair use.

### Effect of the Use upon the Potential Market

As the United States Court of Appeals for the Sixth Circuit has recently noted in *National Rifle Ass'n of America v. Handgun Control Federation of Ohio, et al.*, filed February 1, 1994, "Though not conclusive, the fourth factor ..." which is the effect of the use upon the potential market for or value of the copyrighted work, is " 'the single most important element of fair use.' " (citing *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233). "This factor is generally demonstrated by a showing that the purpose or character of the use was commercial." *Id.* Clearly, in the matter pending before this court the purpose of the use was commercial; not the use by the students but, rather, the use by the named defendants. They were reproducing the copyrighted materials without permission for their own gain.

In *Nat'l Rifle Ass'n, supra*, the Sixth Circuit quoted *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793, stating:

> The Court explained that whether an activity is commercial sets a presumption regarding which way the fourth factor points in a fair use analysis "although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, non-commercial uses are a different matter.... If the intended use is for a commercial gain, that likelihood must be presumed, but if it is for a non-commercial purpose, the likelihood must be demonstrated."

In this case, the copying and publication of materials in the coursepacks will reduce the market for the copyright holding materials. "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566–567, 105 S.Ct. at 2233–2234. "[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the potential market

---

**3.** The works were *Farewell to the Party of Lincoln: Black Politics in the Age of FDR*, by Nancy Weiss; *Public Opinion*, by Walter Lippman; *Political Ideology: Why the American Common Man Believes What He Does*, by Robert Lane; *Social Psychology*, by Roger Brown; *The Nature of Human Values*, by Milton Rokeach; and *Where The Domino Fell: America and Vietnam 1945–1990*, by James Olson and Randy Roberts.

for the copyrighted work....'" *Id.* at 568, 105 S.Ct. at 2234.

[O]nce a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression.

*Id.* at 567, 105 S.Ct. at 2234.

Plaintiffs have filed affidavits which show that permission fees are a significant source of revenues. Princeton Press received $42,700 from such fees from August 1991 through July 1992, and $17,300 from August 1992 through December 1992; St. Martins received $125,000 for fiscal (October) 1992; and MacMillan received (for classroom requests only) $237,415 from April 1991 through March 1992, and $241,000 from April 1992 through December 1992.

Defendants' argument, that the increased exposure of the copyrighted works through the excerpts should actually increase the sales of the original works, is unpersuasive for the reasons stated by the magistrate judge. The court finds that if defendants' practice of refusing to seek permission before copying and selling excerpts from copyrighted works became widespread, there would be a significant loss of revenues to plaintiffs.

Under *Harper & Row,* after the plaintiffs establish such loss, the burden shifts to the infringer to show that the loss of revenue would have occurred even without the infringement. 471 U.S. at 567, 105 S.Ct. at 2234. Defendants have not met this burden. Thus, the fourth factor must also weigh against a finding of fair use.

In *Basic Books v. Kinko's Graphics,* 758 F.Supp. 1522 (S.D.N.Y.1991), the district court in New York found almost identical reproduction of the copyrighted works for sale in coursepacks to constitute infringement and not within the purview of the fair use doctrine. The court finds *Kinko's* persuasive and not sufficiently distinguishable to be inapplicable to this case, as defendants would argue. However, this court has ana-

lyzed the merits of the parties' arguments independently on the basis of the report and recommendation and appellate courts' guidance on the factors to be assessed. Thus, the *Kinko's* decision alone is not determinative of the facts in this case.

After careful weighing of the four factors listed in the copyright infringement statute, as well as others outside of that non-exclusive list, the court finds that defendants have infringed upon plaintiffs' copyrights.

*Injunctive Relief*

■ The court specifically determines that in this fact situation the defendants should be enjoined from any future reproduction of any of plaintiffs' existing or future copyrighted works in light of these defendants' refusal to abide by existing law and the unfounded challenges to copyright law and their right to use copyrighted works.

*Willfulness*

■ Plaintiffs contend that defendants' infringement was blatant and willful for which plaintiffs seek increased statutory damages. Defendants argue that their conduct was based upon a good faith, reasonable belief that their activities were permitted under the law.

The question is posed as to what "willfully" means in this context. In other contexts it might simply mean an intent to copy without necessarily an intent to infringe. It seems clear that as here used "willfully" means with knowledge that the defendant's conduct constitutes copyright infringement. Otherwise there would be no point in providing specially for the reduction of infringement since any infringement which was nonwillful would necessarily be innocent. *This seems to mean, then, that one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes. [Still] one who 'recklessly disregards' a copyright holder's rights, even if lacking actual knowledge of infringement, may be subject to enhanced damages* (emphasis added).

3 *Nimmer on Copyright,* § 14.04[B][3], pp. 14–54 to 14–56.

As the magistrate judge explained, the Sixth Circuit has also held, under the patent laws, that "the existence of an honest doubt concerning the validity of a patent precludes a finding of willfulness." *Eltra Corp. v. Basic, Inc.,* 599 F.2d 745, 757 (6th Cir.), *cert. denied,* 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979).

The parties do not disagree as to the relevant standard (i.e. a subjective good faith, and an objectively reasonable belief), but disagree as to its application to the instant facts. Plaintiffs argue that defendants were aware of their copyrights, aware that the *Kinko* decision held such copying to be infringing, knew of the cases which held commercial copying to be presumptively unfair, and were told by their lawyer that continued copying was a "very risky proposition." Defendants argue that *Kinko's* was not binding upon them, that the statute facially allows "reproduction in copies ... for purposes such as ... teaching (including multiple copies for classroom use)," and point out that defendant Smith consulted counsel, authors, professors and students, as well as exhaustively researching the subject at the University of Michigan Law School library, and has been in the same business for 17 years.

Plaintiffs have carefully addressed the defendants' arguments in their objections to the willfulness findings in the report and recommendation. Plaintiffs argue and support with exhibits the fact that defendant Smith undertook research activities but that he could not reasonably have reached the conclusion that his activities were safe or lawful, or that *Kinko's* was wrongfully decided. The defendants continued to infringe the copyrighted works, knowing full well that they were at risk of being declared copyright infringers. The unrefuted record supports plaintiffs' position.

Based upon the record as a whole and having carefully considered the objections in the responses to the magistrate judge's report and recommendations filed by all the parties involved in this matter, this judge must find that the conduct of the defendants was willful. There is no challenge to the coursepacks per se, but rather to the failure to pay the copyright holders by the parties seeking to sell to others the copyrighted works for a profit. The defendants simply did not agree with what the law required and chose to interpret the law for themselves notwithstanding appellate court opinions and the advise of experts in the field. Contrary to defendants' argument, case law is not in "hopeless conflict." An extensive effort to find law to support their conduct, when they were unable to do so, does not excuse defendants' violation of the established copyright law. They proceeded recklessly at their own peril and should not be surprised that they are now called upon to answer for this unjust enrichment.

Contrary to the defendants' arguments, it is not the students who will be penalized or who will suffer from the finding of willful infringement. Nothing supports the argument that students' costs for the coursepacks will double or triple, especially since other companies are in compliance with the law and are still charging competitive rates. Rather, the defendants will be called upon to compete with others who have elected not to violate the copyright law and they will lose their substantial advantage in the competitive market. Nothing supports the defendants' arguments that they were doing this for the students. They clearly were doing it to realize profit for themselves. Their position was unreasonable and it was a reckless disregard of the copyright holders' property rights. There are ways to challenge court's opinions and court decisions. One does not do so by blatantly violating the law. Based upon the record as a whole, defendants evidenced a lack of good faith in their position. The enhancement of statutory damages was provided to deter this kind of deliberate conduct.

Statutory damages range from a minimum of $500 to a maximum of $20,000 per infringed work. If the infringement was "willful," the damages may be increased to $100,000 per work; if the infringement is found to be innocent (defendant was not aware and had no reason to believe it was infringing) the damages may be reduced to $200.

Substantial damages do appear necessary to deter defendants' future conduct, particularly as they argue to this court that if injunctive relief is granted, it should be limited to the specific publishers involved in this matter and the noted or specifically identified copyrighted works. This evidences an intent on the part of the defendants to continue their present course of conduct and to shift to the plaintiffs the burden of seeking relief in court every time defendants choose to do so. It is the responsibility of the defendants to obey the law. As they are enjoying a substantial profit at the expense of others, they will continue to do so without a strong admonition from this court. Statutory damages therefore are awarded in the amount of $5,000 per infringed work for a total of $30,000. Defendants are cautioned that if they continue such conduct and future reproduction of plaintiffs' copyrighted works without permission, they should anticipate they will be required to pay the maximum enhancement under the statute.

*Attorney Fees*

■ It is appropriate in a case such as this that the plaintiffs recover their attorney fees because the copyright law ultimately serves the purpose of enriching the general public through access to creative works and plaintiffs are encouraged to litigate meritorious infringement claims. The magistrate judge's award of reasonable attorney fees in this case is clearly justified. Copyright law must be protected.

### CONCLUSION

For all the foregoing reasons, plaintiffs' motion for summary judgment hereby is GRANTED. Plaintiffs are awarded $30,000 in statutory damages, costs, and reasonable attorney fees (amount to be determined by the court upon filing of supporting documentation, if the parties cannot agree.) Further, defendants are ENJOINED from copying any of plaintiffs' existing or future copyrighted works without first obtaining the necessary permission. Defendants' motions for summary judgment hereby are DENIED.